Alfred T. NEWBERRY, Jr., et al., Plaintiffs,

v.

The WASHINGTON POST COMPANY, Defendants.

Civ. A. No. 75–1865.

United States District Court, District of Columbia.

Sept. 28, 1977.

---

See also 71 F.R.D. 25.

Wallace Edward Brand, Donald A. Randall, Washington, D. C., for plaintiffs.

Daniel K. Mayers, John Rounsaville, Jr., A. Douglas Melamed, James S. Campbell, Alan R. Finberg, Candace S. Kovacic, Washington, D. C., for defendants.

## MEMORANDUM

GESELL, District Judge.

Fourteen newspaper distributors bring this civil action alleging violations of sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1–3 (1970), the Robinson-Patman Act, *id.,* § 13, and section 3 of the Clayton

Act, *id.*, § 14. Each distributor sues individually,[1] claiming treble damages arising from territorial and customer restrictions on resale, vertical price fixing, and price discrimination in their respective dealings with the Washington Post Company ("the Post"). Injunctive relief in various forms is also requested.

For most of the period under review the Post distributed its newspapers through a dual system of independent dealers; one group of dealers served home subscribers, and the other, single sales outlets. In 1975 the Post announced that it was shifting from a dealer system to an agency system. This decision was acceptable to practically all of the Post's some 180 dealers, except plaintiffs.[2] In addition to their treble damage claims, plaintiffs seek a determination that the agency plan of distribution is unlawful under the circumstances shown and ask that the Post be prohibited from making further sales through agents and be required to return to the former dealer system with all alleged territorial, customer, and price restraints removed.

Prior to trial the parties briefed and argued the legality of the agency arrangement on documented cross-motions for summary judgment, but the Court held action on the motions in abeyance pending development at trial of pertinent facts relating to the Post's prior conduct that plaintiffs' claim was in violation of section 1 of the Sherman Act and other antitrust laws.[3]

. All aspects of the case except those comprehended within the cross-motions have now been tried to the Court without a jury after extensive pretrial proceedings. Numerous facts were agreed upon by the parties, many documents and portions of depositions were received, and 20 witnesses were heard. Having now considered the evidence and extensive briefs and submissions of the parties, the Court has this day filed detailed findings of fact on aspects of the issues thus tried. This Memorandum is intended to summarize and supplement these findings and to present the Court's conclusions of law derived from all facts as found. It will also contain the Court's ruling on the pending cross-motions relating to the agency system.

Plaintiffs' major contention is that prior to institution of the agency system the Post in various ways illegally enforced a rigid scheme of distribution that required each of its dealers to confine his sales to a defined area and class of customer specified in his contract and that illegally fixed the price its dealers were obliged to charge home subscribers. These alleged sales and price restraints are interrelated but must receive separate consideration.

## I. SALES RESTRICTIONS

### A. *Territory.*

Plaintiffs, while dealers, contracted to purchase newspapers from the Post for resale principally to home subscribers in designated areas. Although the dealer contracts contained no explicit prohibition against selling outside the area, they were designed to limit each dealer's sales to a designated area. This territorial arrangement was developed by a course of conduct mutually advantageous to the Post and the dealers. Usual indicia of a coerced territorial agreement between a seller and its dealers were absent. The Post never terminated a dealer's contract because he sold outside his dealership area, and there is no

---

1. Class action allegations were dismissed prior to trial. See Memorandum and Order dated January 13, 1976.

2. Six plaintiffs eventually became agents, while six still remain dealers. Two plaintiffs, formerly dealers, no longer have any connection with the Post.

3. The Court's Memorandum re Summary Judgment-Agency System dated June 14, 1976, stated in part:

> Accordingly, the Court will not act on the cross-motions at the present time but rather will hold them in abeyance pending development of pertinent facts relating to the Post's prior conduct that allegedly constitutes a contract, combination or conspiracy in violation of Section 1 of the Sherman Act. The Court reserves the option to act on the motions at any later stage.

By subsequent Order, all other issues were set for trial.

evidence that any plaintiff was officially advised that he could not sell outside his territory. The Post, however, expected that its home subscribers would almost invariably be served by the dealer assigned to the subscriber's area. Its customer service and field force encouraged this, and its expectations were borne out in fact.

Both the Post and its dealers shared an interest in the widest possible circulation of the newspaper and thus in prompt, reliable, consistent delivery at the lowest possible cost. Both would have confronted many troublesome operating problems if dealers sought to invade each other's territories. Competition would interrupt smooth delivery to subscribers. Difficulties would also be encountered in handling subscriber complaints, new subscriptions, stop orders, billing, and the like because of uncertainty as to which dealer was serving or planning to serve which subscriber.

In addition, competition simply would not have been profitable for the dealers. In areas in which subscribers are widely scattered, the costs of service are very high in relation to the profits to be gained; in high-density areas an established dealer with years of effective service in the area would face lower costs than any dealer attempting to enter. Thus each dealer territory had aspects of a natural monopoly arising from the fact that the territories specified in the dealer contracts were tailored with efficient delivery in mind and had long been worked by competent deal-

ers. The dealers realized that competition among them would be very expensive, requiring cut rates or extra service, and that the prospect of retaliation by the neighboring dealer was always present. They therefore collaborated and shared work in many instances, and with little direction from the Post they did not compete. Boundary disputes were often settled without Post intervention. Dealers who sold newspapers outside of the territory specified in their contracts usually did so as an accommodation to a neighboring dealer.

Given the long period of time in which territorial allocations among dealers were more or less scrupulously observed, a territorial agreement between the Post and each plaintiff dealer must be implied.[4] Cf. United States v. A. Schrader's Son, Inc., 252 U.S. 85, 97, 99, 40 S.Ct. 251, 64 L.Ed. 471 (1920). Under the recent Supreme Court decision in Continental T.V., Inc. v. GTE Sylvania, Inc., —— U.S. ——, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the legality of this vertical restriction[5] is governed by the "rule of reason," which requires a case-by-case inquiry into the purpose and effect of the restriction in question to determine whether it should be prohibited as imposing an unreasonable restraint on competition. White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). The classic formulation of the rule of reason standard was enunciated by Justice Brandeis in Chicago Board of Trade v.

4. In aid of its restriction the Post employed a "base-overbase" pricing system, whereby each dealer was charged one price for the number of newspapers the Post thought could be sold in his territory, and a higher price for all additional newspapers. Cf. Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307, 1319–20 (5th Cir. 1976). This practice was not shown to have had any independent effect.

5. The Supreme Court has recognized the "occasional problems in differentiating vertical restrictions from horizontal restrictions originating in agreements among the retailers." Continental T.V., Inc. v. GTE Sylvania, Inc., —— U.S. at —— n. 28, 97 S.Ct. at 2562 n. 28. The Post, noting the dealers' acquiescence and participation in the territorial scheme, seeks to characterize the restraint as horizontal, thus render-

ing the dealers liable for the practice they themselves condemn. Notwithstanding the dealers' willing participation, however, the scheme was initiated and orchestrated by the Post, and thus was vertical in effect as well as appearance. The cases cited by the Post are not to the contrary. In United States v. Topco, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), and United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), restrictions apparently vertical were deemed horizontal because the dealers actually controlled the manufacturer; in United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), the dealers prevailed upon the manufacturer to impose territorial restrictions. Here, the Post was and is the dominant partner.

*United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918): [6]

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

■ The Post's territorial system of distribution was reasonable. By definition, some potential intrabrand competition was theoretically restricted; but the proof failed to show that any plaintiff was either capable of seriously competing or desired to compete with any other dealer. It is also true that the effects of vertical territorial restrictions are likely to be more pernicious when instituted by a monopolist or near-monopolist like the Post, Washington's only general morning newspaper. *See Adolph Coors Co.,* 3 *Trade Reg.Rep. (CCH)* ¶ 20,403,

at 20,293 (1973), *aff'd,* 497 F.2d 1178 (10th Cir. 1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). This is because absent the restraint provided by interbrand competition, both the manufacturer and the distributor/dealer will be more likely to reap excessive profits from the consumer. *Id.* Yet the record in this case discloses consistently low home delivery prices suggested by the Post after consideration of legitimate business factors.[7]

The purpose of the restriction was simply the furtherance of a legitimate marketing objective: to accomplish maximum market penetration and prompt, efficient, undisrupted delivery to home subscribers. Given the "facts peculiar to the [newspaper] business," the system adopted was reasonably necessary to achieve this objective. *Cf. Albrecht v. Herald Co.,* 390 U.S. at 145, 166, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (Harlan, J., dissenting). It was not the only system possible, as subsequent events demonstrated, nor was it necessarily the least restrictive alternative imaginable, but such a showing need not be made. *American Motor Inns v. Holiday Inns, Inc.,* 521 F.2d 1230, 1249 (3d Cir. 1975); *see* M. Handler, *Twenty-Five Years of Antitrust* 707 (1973). The efficiency generated by the system facilitated low retail prices and wide circulation in complete harmony with both the purposes of the antitrust laws and the public interest in an informed citizenry. *See Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Brief for the United States at 23, *United States v. Arnold, Schwinn & Co.,*

---

**6.** Contrary to the defendant's assertion, evidence of coercion is not required for a finding of illegality; the Sherman Act does not differentiate between contracts enforced by coercion and those maintained by agreement. *See ABA Antitrust Section, Monograph No. 2, Vertical Restrictions Limiting Intrabrand Competition* 14–15 & no. 38 (1977) [hereinafter cited as *ABA Monograph*]. To be sure, several cases cited by defendant require a showing of "firm and resolute enforcement" by the manufacturer before holding a vertical sales restriction illegal. The United States Court of Appeals for the District of Columbia Circuit, however, has never had occasion to adopt such a doctrine.

In any event, the doctrine represented a way around the harsh, broad per se rule of *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), as evidence the reasoning in *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 807–10 & n. 14 (9th Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* —— U.S. ——, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The substitution of a rule of reason standard in *Sylvania* has eliminated the need for such a subterfuge. *See ABA Monograph, supra* at 15 n. 38.

**7.** *See* p. 476 *infra.*

388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).[8]

### B. *Customers.*

Plaintiffs also complain of customer restrictions on resale. It is urged that home delivery dealers could fairly compete with street sales dealers, who serve single-copy sales outlets like hotels, newsstands, drug and convenience stores, and street vending machines ("racks"), but that plaintiffs, as home delivery dealers, were barred from selling to street sales outlets.

It is admitted that competition is feasible. The two types of dealerships, however, differ in a number of respects. Approximately 46 street sales routes cover the same area as the nearly 180 City Home Delivery dealerships. Street sales dealers handle different editions of the paper, have different expenses, and meet different operating conditions. In spite of a general policy of not making city home delivery dealers responsible for sales to single-copy sales outlets, six plaintiffs had contracts providing for resale and delivery to street sales outlets as well as home subscribers. Eight plaintiff dealers' contracts provided for home delivery only. None of these eight plaintiffs has ever asked the Post to amend his contract to provide for the sale to him of newspapers for resale to single-copy sales outlets. None of the eight plaintiffs has ever asked the Post to sell him newspapers at the base rates charged and on the terms accorded street sales dealers. As the findings show, home delivery and street sales dealers often worked out arrangements among themselves and respected each other's territories or outlets.

It is impossible on the record before the Court to find illegal the street sales restriction placed on some plaintiff dealers. The street sales product (different edition) and customers (single sales outlets) suggest a submarket wholly different from that of home delivery sales. *See Blankenship v. Hearst Corp.*, 519 F.2d 418, 423 (9th Cir. 1975); *see generally McGuire v. Times Mirror Co.*, 405 F.Supp. 57, 59–60, 66 (C.D.Cal. 1975). The burden was on plaintiff to show an unreasonable restraint. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, —— U.S. ——, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). That burden was not met. The evidence of injury, moreover, is wholly speculative and inconclusive.

## II. PRICE RESTRAINTS

### A. *Consumer Prices.*

Plaintiffs also contend that each was coerced into charging prices established by the Post and was deprived of his right as an independent distributor to increase the price of papers he sold to home subscribers and carriers. These allegations of price fixing must be viewed in relation to the Post's marketing objectives. The Post is the dominant morning newspaper in the District of Columbia and the immediately surrounding metropolitan area. During the period under review it was a profitable enterprise. Its principal revenues were gained through advertising, not sales. Advertising receipts are directly affected by the overall circulation of the paper, particularly the number of steady home subscribers. Thus the Post, in sharp competition with other advertising

---

**8.** Under the *Chicago Board* formula, vertical sales agreements are often justified on the grounds that they enhance *inter* brand competition. *E. g., Continental T.V., Inc. v. GTE Sylvania, Inc.*, —— U.S. at —— – ——, 97 S.Ct. at 2560–61. In this case the agreement appears neutral with respect to interbrand competition. Presently the Post has little newspaper competition against which to compete. Potential competition, however, was provided for and protected in the dealer contracts: paragraph four allows dealers to distribute other newspapers so long as "the effect of such delivery is [not] to delay delivery of the [Post] . . .

or otherwise make home delivery of the [Post] less attractive to the subscriber." Evidence before the Court indicates that the parties understood the dealers' rights in this regard and that some dealers did in fact distribute material other than the Post. In a noncompetitive market in which its dominant position was established wholly through lawful means, the Post could encourage interbrand competition only by purposefully depreciating its product or service. This it is not required to do. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

media, has vigorously sought to expand circulation and to this end has regularly published and held out its low price both to home subscribers and to single-copy purchasers. The price fixing here alleged is not the customary effort of a seller to prevent its dealers from cutting price for the benefit of consumers. Rather it is the claim that the Post illegally prevented its dealers from charging subscribers more than the announced or suggested price of the paper which appeared daily on the face of the paper and was well known to every purchaser.

The dealer contracts did not contain any provision setting, directing, or even suggesting the price at which the dealer should resell to the subscriber or the so-called "little merchants," or carriers. The price, however, was suggested not only by its appearance in each copy of each edition of the paper but also by billing forms and procedures which the Post encouraged its dealers to use.

Except for a few instances involving charges for special service, late payment, or sales to a particular customer, the published price to home subscribers remained uniform. There is no proof that any plaintiff ever seriously considered or planned a general price increase to home subscribers until September 1975, when plaintiff Newberry raised his price to home subscribers and the Post took retaliatory action, a matter to be considered separately.

To support their claim of vertical price fixing prior to this date, plaintiffs rely on two threads of proof in an attempt to show that this general price rigidity to the ultimate buyer was coerced. First, they present the testimony of an economist who urged at trial that the identity of price over the years is so inconsistent with the natural impulse of all dealers to maximize profit that agreement must be inferred. Second, they claim that they were deterred from raising prices because they feared immediate termination of their contracts and did not want to antagonize the Post's Circulation Department, which is portrayed as an exacting and ruthless unit bent on strict compliance with the Post's scheme of distribution. Both of these claims are rejected, and the claim of price fixing prior to the fall of 1975 must fail for lack of proof. Some of the factors underlying the Court's determination in this regard will be mentioned.

■ Plaintiffs' economic theory of implied agreement is superficially attractive, but it fails once the practical business considerations operating at the time and exemplified in the record are examined. These considerations were wholly ignored by plaintiffs' economist. The Post was in a particularly advantageous position to maintain the resale price of the newspaper through lawful, proper means. Due to its dominant position in the sale and distribution of morning newspapers, it could suggest a price largely uninfluenced by the competition of other publications, and constant readjustments of price to meet competitive developments were unnecessary. Moreover, it is of particular significance that a morning newspaper like the *Post* is mainly presold to subscribers and hence is a repeat sale item. The Post was in a position to present its desired prices daily to all subscribers, and users of the papers were constantly made aware of the prevailing rate. The Post was, in the natural course of events, in constant contact with the dealers' customers through its Service Department. Characteristically, it, rather than the dealers, was the recipient of calls from the public entering new subscriptions, requesting changes in service, seeking information, registering complaints, and the like. This aided the company in maintaining its desired prices.

In furtherance of this objective the Post also took legitimate steps to so arrange its business relations with the dealers that each dealer was more or less assured an annual profit ranging as high as $35,000 to $40,000. The Post's territories were carefully delineated with special regard to efficient delivery. Costs and expenses peculiar to each territory were given special recognition. The Post lent its own resources to promotions and other methods of improving circulation.

The price of the newspaper, moreover, did not remain static. There were increases in the published retail home delivery price: twice in 1970, again in 1972, again twice in 1974, and again in 1977, as a result of which daily home delivery rates arose from $1.95 to $3.60 per month. Dealers often benefitted from these increases. They obviously recognized that the price suggested by the Post was relatively low and beneficial to consumers. Any increase in price might have affected circulation adversely, to the detriment of the dealer. Thus no coercion, combination, or conspiracy was necessary to accomplish the Post's legitimate business purpose. The relatively stable price to the user was the natural result of the confluence of business factors. It is to be noted that the Post also suggested the prices to be charged by dealers to carriers. But here similar business constraints were not at work, with the result that the dealers were far less consistent in following the Post's suggested wholesale price.

The economic theory of implied agreement fails for yet other reasons. Some dealers, including particularly the plaintiffs, sought to improve their situation by forming an association in 1970. The association's objective was to cause dealers to be treated as employees of the Post so that thereafter, through concerted union activity, the "dealer-employee" could obtain four-week paid vacations, insurance benefits, retirement pensions, and "a paid income protection policy." Due to vigorous resistance by the Post, unfair labor practice charges identifying the Post as an employer were filed in 1971, and proceedings ensued which were not terminated until July 1973. Although the status of the dealers was never settled by these proceedings, plaintiffs throughout this period in effect disclaimed their status as independent dealers. In furtherance of their desire to be considered employees, the plaintiff dealers not only sought to unionize as employees but also withdrew their group from a national dealers association soon after learning that the national association emphasized the right of dealers to establish their own prices.

From mid-1973 to mid-1975, plaintiffs through their association continued to seek employee status and press various grievances. Various plaintiffs had contact with key Post personnel in policy positions in face-to-face meetings and by telephone. Topics discussed included extra compensation because of late press runs caused by strikes and other operating conditions, inadequate recognition of certain other dealer costs, a demand for an arbitration clause in the form contract to protect against termination, and related matters. These complaints were considered by the Post, concessions were made for the benefit of the dealers, and frequent meetings with management at its highest levels were held. Yet throughout this entire span from 1970 to mid-1975, the question of dealers raising prices to subscribers was never pressed. The reason is obvious. The dealers had been formally advised in the NLRB hearings as early as 1972 that they had full discretion to raise prices and that prices were not fixed by the Post. Counsel for the Post was on the record in those labor proceedings to that effect, and the plaintiffs confirmed this advice in consultation with attorneys for other associations and through their own independent counsel. It was generally and well known to all plaintiffs at least from 1972 on that the Post's policy was only to set suggested prices.

Plaintiffs unduly emphasize equivocal or casual contacts with Post personnel during which the subject of a possible dealer-initiated price increase was mentioned. The instances are scattered and few. Some were in the nature of jests or "feelers." Dates for the incidents cannot always be fixed with any precision. Given plaintiffs' knowledge that they could price as they chose and that the Post had never taken sanctions against dealers who in one way or another departed from the Post's desired prices, it is impossible to imply coercion or agreement as to dealer resale prices.

■ Absent any evidence of an express agreement or overt coercion by the Post, plaintiffs must fall back on another theory of implied agreement. To explain their

own conduct they claim that they were in effect prevented by fear from taking any price action. This testimony is specifically rejected as to each plaintiff based on demeanor, inconsistencies, and uncertainties in the testimony, and all the surrounding circumstances. As has been noted, these dealers were not reluctant to assert complaints and to confront Post personnel on other issues. Plaintiffs' reliance on the relative economic status of the parties to buttress its intimidation argument is similarly unconvincing. The Post, of course, had far greater resources than the plaintiffs, but in many ways it was dependent on the dealers both for the smooth functioning of its daily distribution, there being no alternative means readily available, and especially during instances of labor controversies, which occurred during the relevant period and made dealer cooperation essential to continuity of publication. The proof shows the Post's constant effort to ingratiate itself with its dealers and, despite some self-serving testimony to the contrary, reflects a cordial, mutually beneficial, working relationship. The suggestion that these staunch plaintiff dealers were afraid to act in their best independent interest is not worthy of belief. And the plaintiff's assertion that they could not afford to litigate is belied by their strenuous pursuit of the NLRB claim and related litigation, as well as by their effective prosecution of the instant suit.

There is no doubt that plaintiffs had fixed in their minds the Post's insistence that circulation be maintained and, where possible, increased. There may well have been some concern in the minds of some dealers, including some plaintiffs, that if a price increase by them resulted in appreciable loss of their circulation, as it well might have, the Post would have a contract option to consider termination. This, however, was not a threat but a business reality derived from factors inherent in the business at hand. Even the basis for concern over termination had been assuaged, first, by the elimination of the 30-day cancellation clause in 1972 and, further, by the Post's acceptance of an arbitration clause in each dealer's contract.

As plaintiffs correctly urge, any coercion by the Post of plaintiff dealers' prices is *per se* illegal; this explicit holding in past cases remains unequivocal, as the Supreme Court's latest review of vertical restraints emphasizes. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* —— U.S. at —— n. 18, 97 S.Ct. at 2558 n. 18. Although in the absence of a formal contract a price-fixing agreement can be implied from a course of dealing in the context of all the facts and circumstances, *FTC v. Pacific States Paper Trade Ass'n,* 273 U.S. 52, 62, 47 S.Ct. 255, 71 L.Ed. 534 (1927), the *per se* rule, because it is so absolute, requires solid proof before it can be implied. *FTC v. Beech-Nut Packing Co.,* 257 U.S. 441, 452–55, 42 S.Ct. 150, 66 L.Ed. 307 (1922); *cf.* note 6 *supra.* Economists and common experience teach that mere price identity may reflect may disparate factors. In the vertical context concrete evidence must be brought forward which raises more than mere suspicion. It must be shown that the seller unlawfully induced or coerced compliance and went beyond merely suggesting price maintenance. *See United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 806–07 (9th Cir. 1975), *cert. denied,* —— U.S. ——, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). Especially in a punitive damage case such as this one, the matter cannot rest on *pro hac* rationalization or surmise founded on self-interest. Where a seller merely publicizes its desired prices, seeks to facilitate them by literature supplied its dealers, and makes its wishes known, it has not engaged in coercion; the Sherman Act does not prohibit a seller from taking these normal business steps to maintain suggested resale prices. *See, e. g., United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Susser v. Carvel Corp.,* 332 F.2d 505, 510 (2d Cir. 1964), *cert. dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). Economic sanctions or termination of dealers who fail to maintain price, on the other hand, are the traditional earmarks of coercion. *E. g.,*

*Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

Prior to the Newberry incident, which will be addressed below, proof of such implied agreement or coercion is wholly lacking. The general stability of price is more persuasively accountable to other factors outlined above, as more fully developed on the record. The instances on which plaintiffs rely have been considered and their insubstantial nature noted in specific findings. Considering the extensive documentary discovery, the searching inquiry made by plaintiffs, and the sweep of the Post's dealings with its almost 200 dealers over a period of five years, the relevant indicia are scattered, wholly unpersuasive, and indeed inconsequential. Moreover, they are heavily overbalanced by the clear proof that Post officials, under trained legal advice, scrupulously avoided interference with dealer pricing and, until Newberry, took no retaliatory action when dealers departed from suggested prices at the wholesale or home subscriber level.

There is no comparison between this case and *Beech-Nut* or *Albrecht*, on which plaintiffs primarily rely. *Beech-Nut* involved not only refusals to deal but also threats of termination, punitive terminations, and conditional reinstatements premised on promises of price compliance. *Albrecht* included threats to terminate, the selection of another distributor who agreed to sell at the required price coupled with the suggestion that customers would be returned to plaintiff if he would get his price in line, plus termination.

### B. *Dealer Prices.*

▮ Plaintiffs also challenge the Post's system of dealer pricing. Noting that each home delivery dealer was charged a price for his newspapers different than other home delivery dealers and the street sales dealers, plaintiffs claim these differentials violate section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a) (1970). To violate the Robinson-Patman Act, however, the price discrimination must occur between persons in "actual, functional competition with one

another." *M. C. Manufacturing Co. v. Texas Foundries, Inc.*, 517 F.2d 1059, 1066 (5th Cir. 1975), *cert. denied*, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *accord, e. g., England v. Chrysler Corp.*, 493 F.2d 269, 271–72 (9th Cir.), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). Apart from the functional difference between street sales and home delivery sales, the fact is that no home delivery dealer even competed with either another home delivery dealer or any street sales dealer, nor did street sales dealers compete amongst themselves. Moreover, no showing of injury has been made.

### III. THE NEWBERRY INCIDENT

▮ One of the strongest dealers in the entire system was plaintiff Newberry, who became an agent in July 1976. Newberry's area lies in the Chevy Chase suburbs where he developed an efficient, growing, well-established dealership. He was ambitious. Over a long period he had not always worked in harmony with the Post. He wanted to expand his area by taking over another dealership, but this was not allowed. He became a leader in the association that sought recognition for dealers as employees and encountered the Post's strong opposition. He was not satisfied with his profit margin.

Newberry decided in September 1975 to raise his price. He notified his home subscribers of an increase in price from $5.00 to $5.25 per month, effective September 1, for daily and Sunday home delivery. This step brought the home delivery price closer to the individual copy price. He sent a circular to his subscribers. His action was immediately known to the Post because some subscribers complained when confronted with a charge above the published price. More importantly, it was also well known to the other dealers, and the question of what action the Post might take became a subject of speculation among them.

On September 3, 1975, the Post wrote to Newberry to notify him that effective October 4, 1975, Newberry's rates for newspapers would be increased pursuant to para-

graph two of his contract. That paragraph, after establishing the price charged to Newberry, provided: "All of the above rates are subject to change by the Post on thirty (30) days' notice in writing to the dealer." From time to time the Post had invoked this provision of the paragraph to readjust prices charged dealers upward or downward to meet changing conditions. If the Post believed that a dealer's overall operation was becoming unduly profitable due to circulation increases or other factors, it would increase the dealer's price. Correspondingly, if conditions in the dealership deteriorated so as to reduce a dealer's profit due to circumstances beyond the dealer's control the price might be lowered to improve that dealer's profit.

In the Newberry instance, utilizing this contract right to readjust, the Post promptly increased Newberry's rates by an amount that deprived Newberry of any benefit from his price increase. The amount of the price increase to Newberry brought the Post additional revenues, over the period from its effective date to the date of expiration of Newberry's contract nine months later, equal to the expected increase in Newberry's retail revenues over the ten-month period from the date of his price increase to the expiration date of his contract.

Newberry was not terminated, but there can be little doubt that this action was taken by the Post knowing that it would become immediately known to all dealers and would serve to deter those who might be contemplating a price increase. The testimony of Mr. Curtis, the Post's Circulation Manager, confirms this belief on the part of the Post. It is possible that some other plaintiffs might have followed suit in whole or in part if this step had not been taken. Dealer costs had been increasing, efforts to get relief through recognition as employees

or otherwise had been unsuccessful, and substantial time had passed since the Post last moved up its published prices. Inflationary pressures were at work.

The Newberry retaliation was a signal to plaintiffs generally that the Post, having established its agency system, was not going to tolerate price increases by the few dealers who had chosen to remain dealers for the duration of their dealer contracts.[9] It was not "unilateral" action beyond the scope of section 1 of the Sherman Act. That term is reserved for the narrow instance in which a simple refusal to deal, without more, is exercised. *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 772, 64 S.Ct. 805, 88 L.Ed. 1024 (1945). Any "methods" employed by sellers that are *"as effective as* agreements in producing the result that 'all who would deal in the company's products are constrained to sell at the suggested prices'" violate section 1. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 42, 80 S.Ct. 503, 510, 4 L.Ed.2d 505 (1960) (quoting *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 455, 42 S.Ct. 150, 66 L.Ed. 307 (1922)) (emphasis added). Here, the Post's action, in conjunction with the otherwise innocuous provision of the dealer contract permitting the Post unilaterally to raise its prices, constituted an unlawful contract in restraint of trade. *See Sum of Squares, Inc. v. Market Research Corp. of America*, 401 F.Supp. 53, 55–56 (S.D.N.Y. 1975); *Bowen v. Wohl Shoe Co.*, 389 F.Supp. 572, 581 (S.D.Tex.1975); *cf. Milsen Co. v. Southland Corp.*, 454 F.2d 363, 368–69 (7th Cir. 1971). *But cf. Quinn v. Mobil Oil Co.*, 375 F.2d 273 (1st Cir.), *cert. dismissed*, 389 U.S. 801, 88 S.Ct. 8, 19 L.Ed.2d 56 (1967).[10] When joined by the Post's retaliatory price rise, the dealer contract imposed an illegal restraint on price closely analogous to instances in which the courts have condemned terminations in response to a

---

9. The present suit was filed November 7, 1975. After suit was brought, two other plaintiffs, Duffy and Hoffman, each raised prices, and the Post similarly recaptured the full increases.

10. Arguably, the Post and those dealers who did not follow Newberry's lead could be said to have formed a "combination" in restraint of

trade prior to the filing of this suit. *See, e. g., Albrecht v. Herald Co.*, 390 U.S. at 150 & n. 6, 88 S.Ct. 869. Having recognized an illegal contract in violation of section 1, however, the Court need not express an opinion as to the existence of any such combination.

dealer's departure from suggested prices. *E. g., Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Germon v. Times Mirror Co.*, 520 F.2d 786, 788 (9th Cir. 1975); *cf. Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

The Post denies that any trade was restrained, noting that Newberry continued to charge higher prices after the Post's action. But this does not reach the heart of the matter. The Post's action was coercive, interfering with plaintiffs' freedom to base retail price levels on market considerations. Although before the Newberry incident the dealers generally adhered to the suggested retail price, pricing decisions were based on business factors and the uncertainties of the market. After Newberry the constraint became only the certainty of Post retaliation. Thus the Post's action "directly interfer[ed]" with the free play of market forces" in determining price levels. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940); *accord, Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951). No more is required to constitute an impermissible restraint. *See Knutson v. Daily Review, Inc.*, 548 F.2d 795, 812 (9th Cir. 1976), *cert. denied,* ─── U.S. ───, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977).

The Post claims it had a legal right to increase its charges to these dealers by the amount of their respective price increases to subscribers. It is suggested that all the Post did was to exercise its rights under the contract to "share" in the dealers' monopoly profits. The Court finds this analysis unpersuasive. Prior retail price increases were initiated by the Post and reflected consideration of business factors such as production costs and the strength of market demand. Similarly, decisions about the extent to which dealers could share in the benefits of retail price increases were as far as the record shows based on analyses of each dealer's costs and the level of profit each was thought by the Post to deserve. The Newberry price increase was the first

initiated by a dealer; given the atmosphere in which it occurred, the Post's recapture of the entire profit derived from the increase cannot be said to have been based on the same legitimate economic considerations noted in the previous incidents. No evidence was produced to rebut the intent manifested by the Post's Circulation Manager, who stated that the action taken against Newberry probably served to deter other dealers from raising their prices. Standing alone, the Post's "sharing" policy may have been reasonable, but coupled with unlawful intent it became an unreasonable restraint of trade. *See United States v. Columbia Steel Co.*, 334 U.S. 495, 522, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948).

*Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690 (5th Cir. 1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976), on which defendant primarily relies in justification of its action, is not to the contrary. The wholesale price increase involved in that case was not made with the intent and effect of totally preventing the wholesaler from departing from prices which the seller had previously announced it desired or of depriving him of any profit if he did depart. Nor are the Court's comments about the elements of injury and damage in that case applicable here. By recapturing Newberry's entire extra profit from sales to already established customers who continued to buy from Newberry, the Post inflicted an injury, and the damage to him cannot be said to be unduly speculative given the strictures of *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Defendant's other cases are equally distinguishable and simply recognize that changes in price charged by the seller to his dealers or wholesalers are often lawful, and that their significance rests upon the context in which they occur and their underlying purpose and effect. The Post's action was illegal in its purpose and effect, and damages must be assessed for injured party plaintiffs from this date for violation of section 1 of the Sherman Act.

## IV. RELIEF

 Newberry and the other two dealers who raised their prices during the pendency of the lawsuit, Duffy and Hoffman, shall each receive the full amount of the increase in price obtained from subscribers from the date of the increase to the date of this Memorandum. This figure will be trebled under 15 U.S.C. § 15 (1970). Perhaps the Post could legitimately have shared in the benefits of some of the price increase, but the Court is without guidance as to what a reasonable division would have been. The Post has failed in its argument that the full amount was subject to legitimate capture, and thus it has not sustained its burden of proof in this regard. The Court will not speculate, especially for the benefit of the culpable party. *See Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

Newberry's dealer contract has expired. Duffy's and Hoffman's continue. An injunction will be entered prohibiting the Post from taking 100 percent or any retaliatory percentage of any amount either of these dealers may obtain after the date of this Memorandum by charging subscribers above the suggested price during the remaining periods of their respective dealerships.

 The remaining plaintiffs were all dealers at the time Newberry raised his price, and although all knew they had a legal right to raise their prices, none ever did so. There is simply no proof that provides a basis for determining when, if ever, a price increase would have been attempted by any of them or in what amount, given the varied nature of the areas they serve and the lack of proof that these areas were comparable to those in which a price increase had occurred. Different standards govern proof of the fact and proof of the amount of damages. *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931). For the latter, it is not enough to show simply that other dealers were aware of the Post's inevitable response to any further price rise. The Court has found that the Post's treatment of Newberry operated to restrain the other dealers' freedom to price without interference; but this does not establish that but for the Post's action, all prices would have been raised, or by what amount. As already noted, many market factors interfered with the superficial plausibility of a "but for" economic theory. The possibility that such a price increase would result in loss of subscribers with a resulting loss of dealership itself was undoubtedly a major deterrent. Each dealer had to feel out the receptiveness of his particular area. There was a wide variation in attitude and affluence of subscribers throughout the metropolitan area of Washington. But most plaintiffs, even under protection of the suit, did nothing at all. Many converted to agency status at an early stage. Cognizant of the Supreme Court's establishment of a relaxed standard of proof of the amount of damages once an antitrust violation has been shown, *see, e. g., id.* 282 U.S. at 563, 51 S.Ct. 248; *Zenith Radio Corp. v. Hazeltine Research Inc.,* 395 U.S. 100, 123–25, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), the Court concludes nonetheless that it would be the sheerest speculation to award more than nominal damages. *See Siegfried v. Kansas City Star Co.,* 298 F.2d 1 (8th Cir.), *cert. denied,* 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962); *Pennsylvania Sugar Refining Co. v. American Sugar Refining Co.,* 116 F. 254, 260 (2d Cir. 1908). *But see Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 909 n. 4 (2d Cir. 1962) (dicta). Each shall receive nominal treble damages of nine dollars, and if subsequent to this Memorandum any who are still dealers increase their prices above the suggested price they will be protected against capture in the same manner as those dealers who effected increases.

There remains for consideration plaintiffs' claim for injunctive relief arising out of their challenge to the agency system. Plaintiffs ask the Court to strike down the agency system of distribution established by the Post in 1975 and to reestablish the dealer system with safeguards against ter-

ritorial, price, and other restrictions. It is claimed that the agency system is inherently illegal and, in any event, must be stricken down because of the Post's prior marketing practices. These contentions are rejected.

It should be noted at the outset that the Post's determination to shift from a dealer to an agency system was made unilaterally, without prior contact with its dealers, and well prior to the Newberry action. The agency system involved a substantial readjustment of the Post's previous marketing procedure and a rearrangement of business risks. Under it, agents provide delivery, collection, and solicitation services in exchange for fees paid by the Post. The agents do not bear the risks of buying and reselling the newspapers, as in the case of dealers. Responsibility for delivery and accountability to the reader for delivery is placed squarely on the Post. The agent receives specified delivery fees, a circulation incentive fee, and a specified fee for each print or insert delivered. He obtains the bulk of his revenue directly from the Post and avoids the uncertainties of payment by the subscriber that the dealer confronted. The agent is given a definite responsibility to maintain the Post's penetration of the agent's area, but he may handle other publications and may arrange with the customer to provide additional services at prices that he sets.

The Post shifted to the agency system largely as a result of the Supreme Court's ruling in *Albrecht*, which cast doubt on the legality of systems of dealer distribution, such as the Post's, then employed by many newspapers across the country. After an unsuccessful effort by the industry to obtain relief from the Congress, the Post determined that a different method of distribution was desirable to avoid the business risks involved and to assure orderly pricing of its product. As a practical matter, there were only two choices that would assure continuance of both the Post's reasonable plan of distribution and the stability of prices charged home subscribers: to use employees or to use agents. The latter was the least restrictive, most reasonable alternative.

■ The shift from dealer contracts to agency contracts was made in a sensitive and appropriate way. All dealer contracts were allowed to run for their full five-year term. No dealer contracts were terminated. Early voluntary cancellation was encouraged only by a modest $1,000 bonus payment. There was no coercion. The great bulk of the dealers, 159 out of 178, accepted. Only the few plaintiffs have persisted in opposition. The system has operated smoothly since it was instituted.

There being no proof that the shift to an agency system was in any way in aid of an illegal price or sales restriction, it must be judged on its face. The Post had no legal obligation to continue any dealership once the contract period had run. In placing the agency system into effect the Post was merely creating a more integrated system of distribution for its own product, as is the right of any seller. A seller does not commit himself irrevocably to one method of distribution once commenced, and he may terminate, modify, and change his distribution system so long as his arrangements are legal. The agency system is a lawful and well-accepted means of distribution. *See, e. g., United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). The dealers were not coerced into becoming agents, and the Post's conduct in adopting the new mode of distribution was less intrusive than that accepted by other courts. *See, e. g., Knutson v. Daily Review, Inc.,* 548 F.2d 795, 805 (9th Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); *McGuire v. Times Mirror Co.,* 405 F.Supp. 57, 64, 66 (D.C.Cal. 1975).

Furthermore, there is nothing in the facts of this case to lead the Court to believe that the agency system must be enjoined in whole or in part to dissipate the effects of the limited past violations shown. The injured plaintiff dealers will be compensated

in damages, and their freedom to price for the duration of their dealer contracts will be sustained so long as they meet their responsibilities under the contract. There is neither legal precedent nor equitable reason why the Court should insist that for the indefinite future the Post should be frozen into a dealer system of distribution. *See In re Multidistrict Vehicle Air Pollution,* 538 F.2d 231, 234–36 (9th Cir. 1976). The Post proceeded over the years in an appropriate manner up until the Newberry incident. That violation was recent, of limited impact, and perhaps little more than a mistake in judgment or legal advice. The Post must pay the appropriate penalty. A dealer system imposed by this Court would amount to undue interference with the seller's right to fashion the manner in which he chooses to sell his own product. It is suggested that the Post has monopoly power and therefore has lost this right. But while the Post undoubtedly has power over price, this is a power gained by success, not predatory measures, and it remains free to choose between selling by employee, agent, or dealer since the choice has not been shown to constitute that "willful maintenance" of monopoly power condemned in *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Plaintiffs are, moreover, but a small minority of the Post's dealer organization. Insofar as this record shows, the agency arrangement is satisfactory to the bulk of the dealers, also small businessmen, who are earning a useful, profitable livelihood. A far stronger showing than that made here would be required before a court of equity would be justified in imposing the greater risks of dealer status upon this group.

Counsel are directed to confer and to present a form of judgment and decree covering the award of damages and the terms of injunction specified and dismissing other claims in accordance with the above rulings of the Court. Plaintiffs are entitled to their reasonable attorneys' fees and costs and shall submit this claim for such fees and costs within thirty days.