990 F.2d 1186
 1993-1 Trade Cases P 70,248
 DeLONG EQUIPMENT COMPANY, Plaintiff-Appellant, Cross-Appellee,
v.
WASHINGTON MILLS ELECTRO MINERALS CORP., f/k/a Washington
Mills Abrasive Co., Washington Mills Ceramic
Corp., John T. Williams and Peter
Williams,
Defendants-
Appellees,
Cross-Appellants.
 No. 92-8049.
 United States Court of Appeals,
Eleventh Circuit.
 May 17, 1993.
 
 William E. Sumner, David A. Webster, Sumner & Hewes, Atlanta, GA, for plaintiff-appellant, cross-appellee.
 Paul Webb, Jr., Philip S. Coe, Webb & Daniel, Atlanta, GA, for defendants-appellees, cross-appellants.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before KRAVITCH, Circuit Judge, GODBOLD and OAKES*, Senior Circuit Judges.
 OAKES, Senior Circuit Judge:
 
 
 1
 The critical question presented by this case involves a conspiracy between a manufacturer and a favored distributor. The object of the conspiracy was to raise wholesale prices to other distributors, including the plaintiff, on products to be sold to one large customer. It is of some significance that the wholesale price, as raised, was higher than prevailing retail prices. The antitrust law question is whether this conspiracy was a device to force an increase in the resale price, or a vertical agreement to fix the minimum resale price in violation of § 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1 (1988) (the "Act"). Resale price maintenance agreements are, of course, per se illegal restraints of trade within § 1 of the Act. Absent such per se illegality here, defendants concededly prevail.
 
 
 2
 This is the third time this court has addressed this case. The second time here, on appeal from a grant of summary judgment for the defendants, this court held that evidence proving such a conspiracy would support a finding of antitrust injury within the line of cases commencing with Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), extending through Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), to and including Business Elecs. Corp. v. Sharp Elects. Corp., 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). DeLong Equip. Co. v. Washington Mills Abrasive Co., 887 F.2d 1499 (11th Cir.1989), rehearing and rehearing en banc denied, 896 F.2d 560, cert. denied, 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990) (DeLong II ).[1] In Delong II, this court indicated that the essence of the alleged conspiracy between the manufacturer and the favored distributor was to inflate the price of the manufacturer's standard product by labeling it "special" and "charging Pratt [the Pratt & Whitney Aircraft Division of United Technologies Corp., a significant customer] a significantly higher price than Washington Mill's list price for [the] identical [product]." 887 F.2d at 1509. Following this court's ruling in DeLong II, a jury trial resulted in a verdict for the plaintiff distributor against the defendant manufacturer, the favored distributor defendant having settled with the plaintiff after DeLong I. We are now faced with an appeal from the district court's denial of motions for judgment notwithstanding the verdict on the plaintiff-distributor's Sherman Act price-fixing, Robertson-Patman Act price-discrimination and common-law fraud verdicts; with a cross-appeal from the district court's grant of a new trial on Sherman Act damages and Robinson-Patman Act damages; and with an appeal from the awarding to the manufacturer defendant of pre-judgment interest on a counterclaim for outstanding debts.
 
 
 3
 Because the key questions in the case involve consideration of issues addressed in this court's last opinion, this appeal thus requires consideration of the ancient but venerable doctrine of "the law of the case." In addition, the case raises questions of sufficiency of proof, injury in fact, and conspiracy. Problems of interlocutory review are not involved, however, since this court granted petitions for review of all of the issues following district court certification, pursuant to 28 U.S.C. § 1292(b) (1988).
 
 I. BACKGROUND
 A. Facts:
 
 4
 While the background facts were well set forth in DeLong II, in the interests of easier understanding, we will recount them here. The plaintiff distributor is DeLong Equipment Company ("DeLong"), a Georgia corporation wholly owned by Harold DeLong. DeLong distributes equipment and supplies used to polish and deburr metal parts in industrial manufacturing processes. The critical product in this process, called "media," consists of abrasive materials which are placed in vibratory machinery with the metal parts to be polished and deburred. Media can consist of natural products, such as sand without the backing paper used in sandpaper. The media involved in this case, however, known as "preformed ceramic media," is made from a blend of clays, sands and polishing agents, extruded through metal molds and cut into different shapes, such as cylinders, stars, rectangles or triangles, after which it is baked and dried. The media is packed by the manufacturer and shipped either to distributors such as DeLong or directly to customers. Distributors, as pointed out in DeLong II, not only provide regular and prompt delivery of media and related supplies, but also consult with the end user, helping it select the appropriate equipment, media, power, speed and time to bring the user's product to the correct state of polish.
 
 
 5
 The manufacturer defendants-appellants and cross-appellees are Washington Mills Electro Minerals Corporation, formerly known as Washington Mills Abrasive Company, located in North Grafton, Massachusetts and in the business since 1868, and its wholly-owned subsidiary Washington Mills Ceramic Corporation, located in Lake Wales, Florida. They are joined in their appeal by the two individual defendants-appellants, officer/owners John T. Williams and Peter Williams (who are not related). For simplicity, we will refer to the Washington Mills Electro Minerals Corp., its officers and its subsidiary collectively as "Washington Mills."
 
 
 6
 The other primary actor in this case, the BCS Company, Inc. ("BCS"), settled with DeLong before DeLong II. BCS, located in Thompson, Connecticut, is a distributor of media with a business quite similar to DeLong's. Both BCS and DeLong have distributed Washington Mills' products since the early 1980s, and BCS was Washington Mills' primary distributor in the northeastern United States during all times relevant to this litigation. Neither DeLong nor BCS itself manufactures media, but both distribute media manufactured by other companies, including but not limited to Washington Mills. Like other Washington Mills distributors, generally speaking, DeLong and BCS purchased media for resale at a wholesale discount rate of 25% off the retail list price. Since no Washington Mills distributors had exclusive territories or franchise areas, the distributors competed for end-user accounts. They received standard price lists showing the size, shape, composition and price per pound of each kind of "stock" media in the Washington Mills manufacturing inventory. The price list also indicated that customers could request "special" media if they met minimum volume requirements and paid for a new die if one was needed to produce the media.
 
 
 7
 The specific, key customer involved was the Pratt & Whitney Aircraft Division of United Technologies Corporation ("Pratt"). Pratt, which manufactures aircraft engines and uses ceramic preformed media to polish its jet engine blades, is not a party to this action but, before this case, was one of Washington Mills' largest end-user customers. As one might suspect, Pratt's engineering department tests and approves the use of specific materials in its manufacturing processes and issues specifications used by the purchasing department to solicit bids for any given products necessary; these specifications appear on Pratt product material control dockets ("PMCs"). With exceptions not relevant here, the Pratt purchasing department may only purchase pre-approved items specified on the PMCs from pre-approved dealers and the materials delivered must have the PMC numbers stamped on the box. The media at issue here, manufactured by Washington Mills for Pratt and known as "special," were approved by Pratt after testing and designated on the appropriate PMCs as "P & W 5,000" (PMC 3175), "P & W 6,000" (PMC 3178) and "P & W 7,000" (PMC 3179). The testing and approval of the Washington Mills products was done by Pratt engineers in East Hartford, Connecticut, in consultation with William and Robert Biebel of BCS. James Neal, a Pratt engineer and a friend of the Biebels, obtained the issuance of the PMCs for the "special" Washington Mills media furnished by BCS. BCS was designated in the Pratt PMC as "manufacturer" and the product was labeled accordingly both by BCS itself and by Washington Mills on empty boxes for the products to be supplied to Pratt.
 
 
 8
 There was ample proof at trial to support the allegations in DeLong's complaint that the "special" media involved in this case was actually generic, that is, media that Washington Mills regularly produced and carried in stock, and that this "special" media, sold to the specific customer around whom this case revolves, did not differ in composition from the generic media stocked by Washington Mills. Thus, the evidence is essentially conclusive that it cost Washington Mills no more to produce the "special" media involved in this case than it did to produce its regular line set forth in its standard price list. Pratt, in other words, was duped.
 
 
 9
 At the time Pratt issued its PMC for the purchase of "BCS-manufactured" special media, Washington Mills was selling the very same media generically to BCS for .495 dollars per pound. This price was based on Washington Mills's standard distributors' discount of 25% off its retail price of .66 dollars per pound. BCS's resale price to Pratt on its initial sales from February through October 5, 1983, however, was .97 dollars per pound, giving BCS a profit of .475, or 96%. Meanwhile, Pratt was both designing a new jet engine and planning on building a new production facility; as of the spring of 1983 it did build such a facility in Columbus, Georgia, not far from DeLong's place of business. Harold DeLong became aware of Pratt's plans and decided to pursue the account as an approved vendor. He began by asking the Washington Mills sales representative, Peter Ford, what type of media was being provided to the Pratt East Hartford plant, but was told only that BCS was "handling" the Pratt account. Harold DeLong was not able to learn from Ford what specific products Pratt required.
 
 
 10
 Nevertheless, DeLong solicited business from Pratt as early as June, 1983. Evidently when word of this got back to Connecticut, the Washington Mills sales representative, Ford, asked Harold DeLong to meet in Atlanta with Robert Biebel of BCS in August, 1983. Biebel indicated to Harold DeLong that he was willing to work with DeLong in a joint venture and that there was "plenty of money in it" for both DeLong and BCS. Harold DeLong declined the offer, reasoning that he did not need BCS's help. After the Atlanta meeting and perhaps after Harold DeLong expressed his suspicions that the Pratt "special" media was really generic, stock Washington Mills media, BCS and Washington Mills agreed on the price-fixing scheme brought into question here. The scheme was that Washington Mills would raise the wholesale price paid by BCS for media to be resold to Pratt from .495 dollars to .85 dollars per pound, but Washington Mills would pay back to BCS the difference. This was to be and was in fact done by sending disguised payments through Wood & Thompson, a foreign corporation in Nassau, the Bahamas, created by BCS shortly after BCS learned that Pratt was locating its new jet engine facility in Georgia. The payback checks and internal vouchers did not identify BCS and were issued for fictitious invoices made payable to Wood & Thompson and mailed directly to the Bahamas. The evidence was that the offshore company was established in order to keep such payments "private," and Washington Mills did not report them to the I.R.S. on a Form 1099. Not surprisingly, perhaps, the payback checks are called "kickbacks" by DeLong and "commissions" by Washington Mills.
 
 
 11
 At an August, 1983 meeting at Pratt's East Hartford, Connecticut plant between representatives of Washington Mills and Pratt, the Washington Mills personnel present gave Pratt the Washington Mills designation of "P & W special 5,000" in connection with the Pratt PMC 3175 and "P & W special 6,000 and 7,000" to correspond to the two Pratt PMCs, 3178 and 3179. As previously indicated, the "P & W special 5,000" was a stock item available at .495 per pound to all Washington Mills distributors, and the "P & W special 6,000 and 7,000" also were identical to media listed in the stock price list at .495 per pound for distributors (at the 25% discount from the retail list price of .66 per pound). On September 1, 1983, the day after BCS filled a purchase order for 10,000 pounds of PMC 3175 destined for the Columbus facility, various Pratt representatives visited DeLong to survey DeLong in response to its previous request for formal supplier qualification. In that meeting, they provided DeLong with a list of the products that Pratt needed, setting forth BCS computer code numbers. DeLong understood from this meeting that it was qualified as a Pratt vendor. On October 6, 1983, Pratt issued a blanket purchase order number 4929748 for 86,400 pounds of PMC 3175 for use at the Columbus plant. DeLong could not bid on this order because Washington Mills had not as yet supplied it with the product identification for Pratt media, with the result that BCS made the sale. Between October 7, 1983 and October 17, 1984 BCS was to fill this entire order at .91 dollars per pound, although at first the order was fulfilled from earlier purchases of media and before the kickback arrangement went into effect.
 
 
 12
 By letter of November 4, 1983, Washington Mills finally provided DeLong with Pratt media designations, but informed DeLong that the wholesale price to DeLong would be .85 dollars per pound. As stated, until that time Washington Mills had charged BCS only .495 dollars per pound for identical media. DeLong immediately called and questioned the "special" designation and the 85-cent price, stating that the media samples appeared to be standard Washington Mills stock media which could be ordered at .495 dollars per pound from the price list. When the Washington Mills representative insisted that the media were special, DeLong replied that "everyone had better be paying the same price for the 'specials'." Indeed, on January 18, 1984, in BCS's first purchase of PMC 3175 thereafter, BCS was charged 85 cents per pound for 12,500 lb. of a Pratt special. Pursuant to the payback agreement, however, Washington Mills paid .355 dollars per pound to BCS through Wood & Thompson, making the BCS price for the special media exactly .495 dollars per pound, the very same price that BCS had paid for the media prior to the Washington Mills November 4, 1983 letter to DeLong. Both Robert Biebel of BCS and the treasurer of Washington Mills testified that the payments to Wood & Thompson were calculated to maintain BCS's pre-November, 1983 price.
 
 
 13
 In the spring of 1984, the Washington Mills representative with whom DeLong had dealt left the company and two new salesmen, Robert Baldauf and Hans Van der Sande, began dealing with DeLong. According to them, DeLong raised the issue of "special designation of Pratt media every time he had the opportunity." DeLong also conducted independent laboratory tests, concluding that the media were identical. Nevertheless, Washington Mills continued to charge DeLong the .85 price and, while DeLong sold some small amounts to the Pratt plant at Columbus, Pratt's requirements for this plant were satisfied largely by deliveries from BCS under the prior October, 1983 order. There was no reason for Pratt to stop ordering media from BCS, though it could have canceled that order under its terms, since it was receiving the product at a price of 91 cents a pound, which DeLong could not meet, given its cost from Washington Mills of 85 cents a pound F.O.B. Lake Wales, Florida. Consequently, DeLong sold a total of only 6,150 pounds of media to Pratt during 1984.
 
 
 14
 Van de Sande testified that after the last deliveries were made by BCS under the October, 1983 order, Biebel, Van der Sande and Baldauf visited Pratt in Columbus, Georgia (almost simultaneously visiting DeLong in Atlanta), to lay the groundwork for using Washington Mills trucks and Lake Wales warehousing to deliver media directly to Pratt at the rate of 750,000 to 1 million pounds per year. According to Biebel, BCS felt secure for three years, since that was the time it ordinarily took Pratt to get a material approved, "unless DeLong d[id] not play the game." According to Van der Sande, this meant that DeLong might "upset the apple cart." As a result of this visit, Pratt's orders were placed directly with Washington Mills as of November 12, 1984, with special retail prices charged for what was actually generic media, and on these direct sales BCS continued to receive kickbacks, though in varying amounts. DeLong, smarting, perhaps, continued to raise concerns regarding the "special" designation and inflated price. Washington Mills terminated DeLong as a distributor in August, 1985, and while it introduced evidence to the effect that the termination was because DeLong had made incorrect payments and DeLong personnel had been abusive, the jury found these claims to be pretextual.
 
 B. Procedural History:
 
 15
 DeLong brought this action in February, 1986, alleging violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1988); § 2 of the Clayton Act as amended by § 1 of the Robinson-Patman Act, 15 U.S.C. § 13(a) (1988); § 3 of the Clayton Act, 15 U.S.C. § 14, and various violations of Georgia law, including breach of contract, tortious interference with business relationships and fraud. DeLong alleged, inter alia, that it was terminated for failure to participate in the scheme between Washington Mills and BCS to fix the price of media sold to Pratt, and Washington Mills asserted as defenses that the termination was in response to payment delays and abusive DeLong employees. This court reversed the dismissal of Robert Biebel and BCS for lack of personal jurisdiction (affirming as to William Biebel) in DeLong I, 840 F.2d 843 (11th Cir.1988). Thereafter, the district court granted the defendants' motion for summary judgment on all counts except some aspects of the Robinson-Patman Act count, but certified the grant under Fed.R.Civ.P. 54(b) to the Court of Appeals which, in Delong II, reversed. 887 F.2d 1499 (11th Cir.1989). After that reversal, the district court vacated its directed verdict in a trial limited to the Robinson-Patman Act count which had been held pending the appeal in DeLong II, granted a new trial as to the claims there tried, and consolidated all counts for a second jury trial which began July 30, 1990 and was concluded after five weeks with 19 witnesses and thousands of pages of exhibits. The district court directed a verdict for Washington Mills on a counterclaim for outstanding bills and submitted DeLong's Sherman Act, Robinson-Patman Act, and fraud claims to the jury. The jury returned a verdict for DeLong on August 21, 1990 on the Sherman Act count in the sum of $2,033,295, on the Robinson-Patman Act count in the sum of $50,216.25 and on the common law count for $117,824, including $100,000 in punitive damages. The district court entered its judgment on September 21, 1990, trebling the antitrust damages to $6,099,885 on the Sherman Act count and $150,648.75 on the Robinson-Patman Act count. On October 1, 1990, DeLong moved to alter or amend the judgment on the counterclaim to eliminate pre-judgment interest, and on October 5, 1990, Washington Mills moved alternatively for judgment notwithstanding the verdict or a new trial as to DeLong's judgment. On April 1, 1991, the district court entered an order deferring ruling on the post-judgment motions, held a hearing on May 2, 1991, and entered an order on September 30, 1991 denying the Washington Mills motions for judgment notwithstanding the verdict on all counts,[2] and denying the motion for a new trial as to liability on the antitrust claims and liability and damages on the common-law fraud count. The district court, however, granted a new trial as to the measure of damages under both the Sherman Act and Robinson-Patman Act counts, and denied DeLong's motion for judgment notwithstanding the verdict as to the interest awarded on Washington Mills' counterclaim. The trial court granted cross motions to certify for interlocutory review pursuant to 28 U.S.C. § 1292(b) on November 20, 1991, and this court granted cross petitions for such review.
 
 C. Standard of Review:
 
 16
 This court reviews de novo a denial of judgment notwithstanding the verdict, see Watts v. Great Atl. & Pac. Tea Co., 842 F.2d 307, 309-10 (11th Cir.1988), including in an antitrust case the question of antitrust injury which is one component of whether or not the plaintiff has standing, a question of law. See Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1448 (11th Cir.1991). The grant of the motion, as here, for a new trial is generally reviewed under an abuse of discretion standard, though when it is on evidentiary grounds the verdict must be against the great weight of the evidence to sustain the grant. E.g., Rixey v. West Paces Ferry Hosp., Inc., 916 F.2d 608, 611-12 (11th Cir.1990); Jackson v. Magnolia Brokerage Co., 742 F.2d 1305, 1307 (11th Cir.1984).
 
 
 17
 Review is of course de novo where the trial court's order involves an error of law. See, e.g., Allstate Ins. Co. v. Springer, 269 F.2d 805, 808 (6th Cir.1959), cert. denied, 361 U.S. 932, 80 S.Ct. 370, 4 L.Ed.2d 353 (1960). We recognize that bearing on the above are the points that the grant of a new trial on an evidentiary basis involves a possible intrusion upon the function of a jury, Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1556 (11th Cir.1984); Spurlin v. General Motors Corp., 528 F.2d 612, 619-20 (5th Cir.1976), and that damages are an issue as to which considerable discretion is committed to the jury, Quality Foods, Inc. v. U.S. Fire Ins. Co., 715 F.2d 539, 542 (11th Cir.1983); Hobart Bros. Co. v. Malcolm T. Gilliland, Inc., 471 F.2d 894, 903 (5th Cir.), cert. denied, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973) (antitrust damages); see Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123-24, 89 S.Ct. 1562, 1576-77, 23 L.Ed.2d 129 (1969) (antitrust). At the same time, we recognize that both Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), involving a horizontal restraint on trade, and Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), involving a vertical restraint, limit the permissible range of inferences of conspiracy that may be drawn in the antitrust context of restraints of trade.
 
 II. DISCUSSION
 
 18
 We will discuss the issues in the case much as the parties have in their briefs, viz: by separating the issues appealed by Washington Mills resulting from the denial of its motions for judgment notwithstanding the verdict and the issues on the cross-appeal by DeLong resulting from the grant of the Washington Mills motions for a new trial in respect to damages, on both the Sherman Act and the Robinson-Patman Act counts.
 
 A. Proof of Conspiracy:
 
 19
 Washington Mills claims that there was insufficient evidence at trial to support a finding of conspiracy, and that the inferences of concerted action between BCS and Washington Mills were negated at trial by the testimony of plaintiff's own witnesses, Washington Mills having called Robert Biebel, Baldauf and Van der Sande. We note that Baldauf, a former southeastern sales representative for Washington Mills, and Van der Sande, Washington Mills' former national sales manager, both left Washington Mills to form a competing manufacturer, Ceratech. Baldauf and Van der Sande testified that they had not known of any effort to fix prices of media or acted in furtherance of a conspiracy to fix those prices. Robert Biebel testified that he had nothing to do with the 85 cents per pound charged BCS or DeLong for the Pratt "special" media by Washington Mills, or had any agreement with anybody at Washington Mills as to the price at which BCS would sell media, whether before or after DeLong was terminated, or the price at which Washington Mills would sell media to DeLong, or with anyone as to termination of DeLong as a distributor. Washington Mills contends that against this "direct and positive evidence" DeLong offered only a string of inferences that an agreement on price could have been reached, and that this evidence is "so highly ambiguous" as not to support a finding of conspiracy according to the terms of Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 763, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984) and Riverview Invs., Inc. v. Ottawa Community Improvement Corp., 899 F.2d 474 (6th Cir.), cert. denied, 498 U.S. 855, 111 S.Ct. 151, 112 L.Ed.2d 117 (1990). We agree with DeLong, however, that there was substantial evidence to support the finding of conspiracy. There was evidence that the so-called "special" media for Pratt was identical to stock media, and that the increased price charged by Washington Mills for the product to Pratt was not justified by any cost differential. Indeed, two of the "special" media, known as P & W 6,000 and P & W 7,000, were clearly identified as stock media on Washington Mills' price list. As for P & W 5,000, while it was not listed on a stock price list, it was available at all relevant times at the stock price on orders for more than 10,000 lbs. or at the stock price plus a nominal charge for producing a die on smaller orders; as to it, the actual added cost was minimal, and it was composed of the same materials as the other generic media. Moreover, Washington Mills sold all three types of "Pratt" media to other customers as well as to BCS, at the stock price.
 
 
 20
 In addition, it was the Washington Mills sales representative, Peter Ford, who arranged the meeting between Robert Biebel of BCS and Harold DeLong in August, 1983, at which meeting Biebel proposed a "joint venture," saying "there is plenty of money in it" for everyone. It was after this meeting that Washington Mills joined in the arrangement for special pricing of $.85 per pound to BCS, with a "kickback" or "commission" to BCS through BCS's offshore affiliate, Wood & Thompson, reducing the effective price to the original $.495 per pound.
 
 
 21
 At about the same time that Ford met with DeLong, he met with Pratt in August, 1983 and gave it the new Washington Mills special media designations for the stock media sold to distributors at .495 per pound, retailing for $.66 per pound. BCS quoted Pratt a price of $.91 per pound in its successful October, 1983 order but Ford ignored DeLong's September 1, 1983 request for confirmation of the identity and price of these "specials" and delayed giving DeLong a Washington Mills quotation long enough to prevent DeLong from bidding on the October, 1983 order. When Ford did finally write to DeLong on November 4, 1983, calling the Pratt media "specials" and quoting the distributor price as $.85 per pound, BCS did not receive a price announcement letter. As DeLong points out, the jury could have concluded properly that BCS was not informed because it was part of the conspiracy which already knew the price arrangements, including the kickback arrangement, which would enable it to make up the difference between the regular price for generic media and the .85 quote to DeLong.
 
 
 22
 A year later, in October, 1984, Van der Sande and Baldauf came into the picture, at the time BCS was scheduled to make the last delivery to Pratt under the October, 1983 order. By this time, Washington Mills and BCS had a new scheme to support the Pratt price. They urged Pratt to purchase media directly from the manufacturer, bypassing DeLong, with Washington Mills agreeing to pay kickbacks to BCS even on the direct sales. Indeed, Van der Sande's report of that meeting stated that Robert Biebel had said he had several good friends at Pratt who from time to time took trips on his boat to the Bahamas, which friendships gave him an edge on the competition. Van der Sande thought that Pratt would likely become Washington Mills' largest media customer, buying $750,000-$1,000,000 worth of media per year. Van der Sande reported to Washington that "Bob Biebel feels we are secure for at least three years unless DeLong does not play the game." Van der Sande did not mention his meeting with the Pratt people in Georgia the day before he visited DeLong, but he did say that DeLong was "not very happy" with BCS and Pratt.
 
 
 23
 Perhaps the critical fact in terms of a conspiracy is that Washington Mills rebated to BCS the total difference, right to the half penny, between its new 85 cent price and the 49.5 cent stock price. This totally destroyed any argument that increased costs justified a higher price. If it was supposed to reflect some greater care or concern on the part of BCS toward Pratt, then DeLong should have been allowed to accept the same degree of responsibility at the same price. Instead, Delong, when it continued to complain about the pricing and the use of stock media under "special" labels to Pratt, was terminated on what the jury found were the pretextual reasons of being behind in payments to Washington Mills and abusive to Washington Mills personnel, allegations that were identified by the Court of Appeals in DeLong II as "[g]enuine issues of material fact...." 887 F.2d at 1513.
 
 
 24
 The long and the short of it is that the jury could properly conclude that Washington Mills and BCS conspired to fix the price of Washington Mills media both to DeLong and to Pratt under the fraudulent cover that the generic media was "special," and by the fraudulent means of kickbacks by way of "commissions" to BCS's offshore shell corporation.
 
 
 25
 B. Legal Arguments on the Sherman Antitrust Act Claims:
 
 
 26
 Of considerably more stature are appellant's three principal legal arguments, namely, that DeLong failed to establish "antitrust injury"; that DeLong failed to establish "injury in fact" (because numerous other sources of supply were available to DeLong); and that DeLong failed to establish an agreement regarding resale price, as required by Business Electronics, on the basis that resale price maintenance is a required element of a vertical price-fixing claim, and that there was no evidence at trial of a fixed "pad" to be added to BCS's resale price or any other agreement or restriction on the price to be charged by BCS.
 
 
 27
 Each of these legal arguments runs headlong into the doctrine of "law of the case." As well put in another antitrust act case decided by this court's predecessor, the Fifth Circuit, a decision of the Court of Appeals at an earlier stage of the same case represents the law of the case not only as to matters "decided explicitly" but also as to those "decided by necessary implication." Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 19 (5th Cir.1974), cert. dismissed, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). The district court must follow the appellate decision as to these issues on remand, id., and generally speaking the appellate court must do so in future rulings in the case as well, id. at 19-20. Recognizing that the doctrine "is not an inexorable command that rigidly binds the court to its former decisions, but rather is an expression of good sense and wise judicial practice," id. at 19, the general rule is that "an appellate court's decision of issues must be followed in all subsequent trial or intermediate appellate proceedings in the same case" except when there are "the most cogent of reasons," such as a change in controlling authority, new evidence or the need to avoid manifest injustice. Id. at 19-20. See also, e.g., Virgin Atl. Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245, 1255 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992). As the Supreme Court has said, the "[l]aw of the case directs a court's discretion, it does not limit the tribunal's power." Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). See also 18 Charles A. Wright, Arthur R. Miller and Edward H. Cooper, Federal Practice and Procedure § 4478 at 790 (1981).
 
 
 28
 Under the law of the case doctrine, DeLong II basically decided the Sherman Act liability claims against Washington Mills on the matters of law argued here, and there has been no intervening change in the law since DeLong II was decided. See DeLong II, 887 F.2d 1499. The DeLong II court addressed these issues in the context of a grant of summary judgment to the defendants on the theory that the conspiracy alleged and the evidence adduced to establish it did not describe a vertical restraint on trade. The DeLong II court held that the alleged conspiracy to restrain competition here was "to fix prices of media sold to Pratt by designating ordinary media as 'special' media and selling it at an artificially inflated price to Pratt." 887 F.2d at 1505. The DeLong II court ruled that such a conspiracy, if proven, was a vertical restraint within the meaning of Business Electronics Corp., 485 U.S. at 730 & n. 4, 108 S.Ct. at 1522 & n. 4, DeLong II, 887 F.2d at 1505-06, and furthermore that it was a vertical restraint that "include[d] some agreement on price or price levels." Id. at 1506 (quoting Business Elecs, 485 U.S. at 736, 108 S.Ct. at 1525). After pointing out that this case involves termination of DeLong as a distributor of Washington Mills "in furtherance of" the vertical price restraint conspiracy, DeLong II, 887 F.2d at 1505, the court in DeLong II, citing Monsanto v. Spray-Rite Service Corp., 465 U.S. at 760-61, 104 S.Ct. at 1469, distinctly held that the restraints alleged there and proven on remand were not "non-price in nature" as the district court had held, 887 F.2d at 1506-07, but, rather, constituted "a vertical price conspiracy," id. at 1507, within the meaning of Business Electronics, "to artificially inflate or 'pad' the price." 887 F.2d at 1507 & n. 11. The DeLong II court went on to hold that the conspiracy alleged was an objectively and economically reasonable one within the meaning of Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538, and that there was not only evidence of concerted action by inference, but a tendency of the evidence "to exclude the inference of independent action." DeLong II, 887 F.2d at 1508-09 (quoting Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc., 818 F.2d 1530, 1534 & n. 4 (11th Cir.1987)). Reciting the evidence of conspiracy above mentioned, the DeLong II court went on to demonstrate how the evidence supported DeLong's assertion that it was an obstacle to the continuation of the scheme between Washington Mills and BCS to "pad" the Pratt price, and that DeLong was terminated to remove that obstacle, 887 F.2d at 1512-15, adding that DeLong had "adduced evidence which tends to exclude the possibility that Washington Mills was acting independently when it terminated DeLong." 887 F.2d at 1514.
 
 
 29
 Thus, the law of the case doctrine is applicable and we see no reason to hold otherwise. While DeLong II did not say that the evidence presented necessarily established the vertical price conspiracy, it did say that the evidence of such a conspiracy sufficed to defeat summary judgment. On remand, a jury presented with evidence at least as strong as that recounted in the DeLong II opinion concluded that such a conspiracy had been established.
 
 
 30
 Nevertheless, we realize that the doctrine of the law of the case "permits a change of position if it appears that the court's original ruling was erroneous." DiLaura v. Power Auth. of the State of N.Y., 982 F.2d 73, 77 (2d Cir.1992), quoting Petitions of the Kinsman Transit Co., 388 F.2d 821, 825 n. 9 (2d Cir.1968). See also Arizona v. California, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 1391 n. 8 (1983). Recognizing the great deference that is owing to the unanimous determination of the previous panel on summary judgment, "reached in a case that [was] already well advanced and designed to control further proceedings," 18 Wright, Miller & Cooper § 4478 at 796, we nevertheless in the interests of certitude reexamine on the merits the points of law raised.
 
 
 31
 1. Injury in Fact.
 
 
 32
 Perhaps least susceptible to law of the case argumentation is Washington Mills' point that DeLong did not establish injury in fact because it was undisputed that numerous other sources of media were and are available to it; thus, the defendants argue that there is no causal connection between the termination and DeLong's claimed lost profits because there were "alternative comparable substitute[s] for the desired merchandise." Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc., 459 F.2d 138, 148 (6th Cir.1972). The basis for this argument is an admission by DeLong's expert, Dr. Seaman, that it was a "possibility" that DeLong could capture all of Pratt's business, selling media furnished by other manufacturers DeLong "[could] get approved." That condition--that DeLong could get other media approved--was explicit in the question put to Dr. Seaman.[3] As we have noted, however, Pratt, presumably concerned with the extraordinarily high standards applicable to jet aircraft engine propellers, had careful procedures for approving products to which the Washington Mills media already had been subjected. It would not automatically approve any preformed ceramic abrasive media, made by any manufacturer. The verdict indicates that the jury rejected the "possibility" that DeLong could compete effectively by simply getting Pratt to approve alternative products.
 
 
 33
 Washington Mills' more significant argument is that DeLong failed to establish antitrust injury, that is, injury "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). In other words, as later put in Atlantic Richfield Co. v. USA Petroleum Corp., 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), even where the conduct complained of is illegal per se, a plaintiff must show that it is "adversely affected by an anti-competitive aspect of the defendant's conduct." Id. at 339, 110 S.Ct. at 1891 (re claims under § 4 of Clayton Act). See also id. at 339 n. 8, 110 S.Ct. at 1890 n. 8 (quoting Phillip P. Areeda and Herbert Hovenkamp, Antitrust Law p 340.3b at 411 (1989 supp.); Areeda and Hovenkamp p 340.3b at 470 (1991 supp.). Washington Mills also refers to Todorov v. D.C.H. Healthcare Authority, 921 F.2d 1438 (11th Cir.1991), for the proposition that determining antitrust standing "involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." Id. at 1448. Todorov recognizes that a showing of antitrust injury, while necessary, is not always sufficient to establish standing. In short, these cases involve plaintiffs who protested their not being allowed to participate in an anti-competitive arrangement, or their loss of a monopolistic position.
 
 
 34
 However, DeLong's injury was a loss of opportunity to compete. DeLong made no further sales of preformed ceramic media to Pratt after its termination. DeLong sought to obtain the list price for purposes of its charges to Pratt, doing what it could to reveal the padded price, and, hence, it can be said that DeLong was willing to subject itself to the competitive market for Washington Mills media and was not in the quest for "super-competitive" profits. Washington Mills, with a better product, offered better-than-competitive prices for its stock media.
 
 
 35
 Todorov, which incidentally cites DeLong II with approval on the means of establishing conspiracy, 921 F.2d at 1456, is not to the contrary. The plaintiff in that case relied upon a monopolistic profit theory to support recovery; unlike Dr. Todorov, DeLong was not interested in forestalling competition and maintaining an inflated price, but in obtaining the stock price at which he could make a profit that was usual in the business with the basic markup. In short, nothing in this case indicates that DeLong sought to benefit from the Washington Mills-BCS anti-competitive conduct or to obtain super-competitive prices. DeLong's contentions properly gave it standing on the basis that Washington Mills, at BCS's instigation and with BCS's assistance, unfairly took advantage of its short-term position as the only approved source of media by artificially inflating the wholesale price and thereby extracting super-competitive profits which it shared with BCS by payment of "commissions" or "kickbacks"; that it blocked competition among distributors of its generic media in the market for one of its largest end-customers; and that it terminated DeLong as a Washington Mills distributor when DeLong threatened not to "play the game." Thus, DeLong has sustained antitrust injury by loss of its Washington Mills distributorship and consequent loss of sales and profits. Because Washington Mills media had certain competitive advantages over alternative media, DeLong has not suffered damage simply from its own failure to compete in an open market with identical media made by other manufacturers. DeLong was not allowed to participate in the competitive market for Washington Mills media because it refused to go along with the Washington Mills/BCS price-fixing scheme.
 
 
 36
 But Washington Mills goes a step farther in arguing that DeLong's claimed injury boils down to the contention that, absent Washington Mills overcharging, Pratt would simply have continued to purchase Washington Mills products, without examining alternative sources of supply. On this basis, it is argued that DeLong's injury results from increased competition, which is by definition not an antitrust injury. Washington Mills and BCS, however, had seen "a window of opportunity," according to the testimony of Washington Mills President and controlling shareholder John Williams, during which they could charge non-market prices without regard to competition. Given BCS's approval and Pratt's purchasing practices, the conspirators had the power to exclude competition and maintain high prices over a longer haul--Biebel was quoted as saying "we are secure for at least three years unless DeLong does not play the game"--so long as DeLong cooperated. True, Pratt has switched to another brand of media, and a witness for DeLong suggested that DeLong could have won that contract had it bid competitively. But DeLong was at a disadvantage in bidding for the Pratt business since it could not offer Washington Mills media. The jury could have decided that DeLong lost the share of the competitive market which it would have had if it had it been able to offer Washington Mills media in the future. No quarrel is had by Washington Mills with the court's repeated instructions to the jury that only losses of business which would have been retained in a competitive market were actionable.
 
 
 37
 2. Failure to show a conspiracy over resale prices.
 
 
 38
 Washington Mills argues, as best we fathom, that Business Electronics made it abundantly clear that the only vertical restraints deemed to be per se illegal under the Sherman Act are agreements relating to resale price, and that the relevant price in the vertical context is "agreement on the price or price levels to be charged by the remaining dealer." Business Elecs. Corp., 485 U.S. at 726, 108 S.Ct. at 1521. The alleged agreement here, the argument runs, was not to fix the retail price, but to fix the wholesale price of media sold to DeLong, or at best to Pratt. Since there was no showing here of any agreement between Washington Mills and BCS as to the price at which the latter would resell to Pratt, the argument continues, there is no per se illegality.
 
 
 39
 This argument meets the law of the case doctrine head-on. As the DeLong II court recognized, all that is required is proof of a fixing of retail price "levels"; this is all that Business Electronics addresses, referring to "a further agreement on the price or price levels to be charged by the remaining dealer." Id., 485 U.S. at 726, 108 S.Ct. at 1521 (emphasis added). While there was no requirement of adding a "fixed pad" to the price to Pratt, there is no question but what Washington Mills and BCS voluntarily agreed to pad the Pratt price. It will be recalled that Biebel of BCS suggested that BCS and DeLong handle the Georgia Pratt business together, assuring DeLong that there was "plenty of money in it for both of us." When DeLong refused to "play the game," Washington Mills raised the price to DeLong to 85 cents and schemed with BCS so as facially to raise the BCS price to the same amount, while surreptitiously rebating the difference between the 85 cents and the 49.5 cent list price for the same stock media. By fixing the wholesale price level at 85 cents, DeLong or any other distributor would have been required to sell to Pratt at the wholesale price plus expenses and market profits, so that what would result would be the equivalent of resale price maintenance. Price-fixing at the wholesale level, as testified to by a DeLong expert economist, was the mechanism by which the retail price was maintained. The agreement in this case, then, was that future sales by anyone--Washington Mills, BCS, or a duped distributor such as DeLong--would be at the premium price.
 
 
 40
 In general, of course, the fixing of wholesale prices poses no antitrust problem. See 8 Phillip P. Areeda, Antitrust Law p 1627 at 316 (1988) ("otherwise, every wholesale price would be illegal--an obviously senseless result"). However, as Areeda notes, complex wholesale price formulae may be the means by which resale price fixing is accomplished, where the formula "so var[ies] the wholesale price in accord with each dealer's resale price as to be the full or substantial functional equivalent of resale price-fixing agreements." Id. at 317. See also id. p 1627d at 319, et seq. As an example of such a functional equivalent retail price fix, Areeda cites Newberry v. Washington Post Co., 438 F.Supp. 470 (D.D.C.1977), in which a manufacturer raised the wholesale price to a particular dealer by the amount by which the actual retail price exceeded the manufacturer's suggested resale price, thus effectively preventing the dealer from charging more; there, it was significant that the increase was applicable only to one dealer. Id. p 1627 at 320-21. Here, to be sure, the wholesale price was not set in response to a dealer's price reduction or increase, but, rather, so as to retain the sweetheart arrangement between the manufacturer and the favored dealer BCS; when DeLong would not comply with the scheme, his dealership was terminated, and, as we read Areeda, he would find this "a vertical price-fixing agreement." Id. p 1627 at 321.
 
 
 41
 To be sure, Areeda recently criticized DeLong II as having "adopted an unduly broad concept of what constitutes resale price maintenance." Areeda and Hovenkamp p 1622' at 1049 (Supp.1991). The supplement's analysis of the DeLong II case in this respect is not up to that well-known treatise's customary high standards, however. It refers to the fact that the plaintiff was "allegedly terminated because it frequently called the attention of customers [sic] and others to this fraudulent scheme," a misstatement of fact. The analysis suggests that the defendant (Washington Mills) might be guilty "merely of successful product differentiation," a far cry from the facts of this case where there was considerable evidence of fraud; or of Robinson-Patman violations "(if the high-priced customer competes with low-price customers)," id., surely not the case here. The supplement then says "[b]ut the supposition of the supplier and the actual charge of higher prices for supposedly premium products do not constitute an agreement setting a resale price...." Id. We do not know to which "supposition" the quotation refers, nor do we know how this squares with the analysis in the main volume of wholesale price schemes which operate as the functional equivalent of resale price-fixing. Certainly an agreement is required to present antitrust problems, but here we have one: an agreement between Washington Mills and BCS to inflate all distributors' end price of products destined for one large customer by eliminating price competition at the dealer level. The Areeda supplement describes the supplier and distributor's agreement to divide the excess profits from their fraud-tainted sales as an agreement with "some" of the attributes of a resale price maintenance agreement, but treats the BCS-Washington Mills deal as "no more than the distributor's reward for participating in the fraudulent scheme." Id. It was not only a reward, however, but an integral part of the very scheme to inflate prices charged by both dealers, and thus a boon for eliminating distributor competition. While it may generally be true, as Areeda argues both in the supplement and in the main volumes, that the supplier would be better off if the distributor charged less than the agreed-on price, because then it would make even more fraudulent sales, the fact is that in this case the supplier's temporary monopoly position, achieved by fraud and by Pratt's careful approval practices for choosing media, allowed it to reap the benefits as well. This may have been short-sighted, in light of the fact that Pratt now uses another brand of media, but nonetheless Washington Mills evidently chose to combine with one of its dealers to eliminate price competition in the market for media sales to Pratt. We believe that the Areeda supplement analysis overlooks the functional equivalence argument made in the main volume and, as such, does not carry the day with us.
 
 
 42
 3. Argument that failure of proof of Sherman Act damages mandated a judgment notwithstanding the verdict, not merely a new trial on damages.
 
 
 43
 The defendants further argue that while the trial court correctly found that the verdict awarding lost profits was based entirely on unsupported assumptions and must be set aside, the appropriate relief should have been the grant of judgment notwithstanding the verdict. Cf. Chrysler Credit Corp. v. J. Truett Payne Co., Inc., 670 F.2d 575, 582 (5th Cir.), cert. denied 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982) (defendant entitled to directed verdict on Robinson-Patman Act claims because "[s]elf-serving and unsupported assumptions cannot sustain a calculation of going concern value. The burden of putting forth substantial evidence is not satisfied by mere speculation and guess work."). However, as we note in the discussion of the new trial motion, DeLong provided substantial evidence of the damages resulting from its loss of the distributorship and consequent loss of sales and profits, based on evidence of its past performance in the marketplace and not simply on "speculation and guess work." As the Supreme Court has noted, antitrust damages of this sort are difficult to prove, and "it does not ' "come with very good grace" ' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 566-67, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981) (quoting Hetzel v. Baltimore & Ohio R. Co., 169 U.S. 26, 39, 18 S.Ct. 255, 260, 42 L.Ed. 648 (1898) (in turn quoting United States Trust Co. v. O'Brien, 143 N.Y. 284, 289, 38 N.E. 266 (1894)).
 
 
 44
 C. Legal Arguments on the Robinson-Patman Act claim:
 
 
 45
 The district court's denial of judgment notwithstanding the verdict on the Robinson-Patman Act claims is unassailable. Section 1 of the Robinson-Patman Act, which of course amends and appears as section 2 of the Clayton Act, 15 U.S.C. § 13 (1988), makes it unlawful for a seller engaged in commerce to discriminate in price between different buyers. This case involves Washington Mills' charging BCS $.495 per pound for the same media it sold to DeLong for $.85 per pound, thereby permitting BCS to sell to Pratt for $.91, below DeLong's retail price of $.97. On the surface, this is discrimination in price. It is not suggested that the statutory defenses of meeting competition or due allowance for differences in cost are available here, and the judicially-created "availability defense" as stated, e.g., in Shreve Equipment, Inc. v. Clay Equipment Corp., 650 F.2d 101, 105 (6th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981), is foreclosed by the law of the case under DeLong II, 887 F.2d at 1516-17. The only argument seriously advanced here--and to state it makes it appear to border on the ridiculous--is that DeLong and BCS were not in functional or geographic competition with one another, see, e.g., Parrish v. Cox, 586 F.2d 9, 11 (6th Cir.1978) (competition must be in same geographical market); M.C. Manufacturing Co., Inc. v. Texas Foundries, Inc., 517 F.2d 1059, 1068 n. 20 (5th Cir.1975), cert. denied, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976). However, there is no doubt but that both BCS and DeLong were after the same Pratt dollar and, while BCS was primarily a New England distributor and DeLong a southeastern one, both were obviously in head-to-head competition for the Pratt Columbus, Georgia expenditures for jet propeller polishing media, and at corresponding or overlapping time periods. Both were competitors during the startup period for Pratt's Columbus plant beginning in 1983. Deliveries to BCS for fulfilling the Pratt Georgia orders were initially made to a warehouse in Manchester, Connecticut and transported to Columbus periodically for a year's period during which DeLong, which had begun soliciting business in June of 1983 from Pratt, made only minimal sales to Pratt's relatively nearby new plant. BCS sales to Pratt thus directly competed with potential sales by DeLong. Cf. Hartley & Parker, Inc. v. Florida Beverage Corp., 307 F.2d 916, 921 (5th Cir.1962) (competition could be established if plaintiff showed "that it had a substantial stock on hand ... and that in selling that stock it was in present and active competition with [the defendant]."). Moreover, at least by September 1, 1983, DeLong had been approved as a vendor by Pratt and the subsequent releases of sales under the earlier October contract made by BCS were thus directly competitive with any DeLong sales. True, BCS had no local Georgia warehouse to meet Pratt's 24-hour delivery requirements, but by virtue of its sweetheart price arrangements with Washington Mills it was enabled both to foreclose DeLong from competing in Georgia for a year and to weaken DeLong's long-term position. While there must be two sales made by the same seller to at least two different purchasers at two different prices, Pierce v. Commercial Warehouse, Div. of Thompson Automotive Warehouse, Inc., 876 F.2d 86, 87 (11th Cir.1989) cert. denied, 493 U.S. 1045, 110 S.Ct. 841, 107 L.Ed.2d 836 (1990), there is no requirement that the two sales be made at precisely the same time or place. It is sufficient if the complaining party demonstrates some sort of real competitive injury. Chrysler Credit Corp. v. J. Truett Payne Co., 670 F.2d at 581-82; M.C. Mfg. Co., 517 F.2d at 1065-68. Washington Mills' motion for judgment notwithstanding the verdict on the Robinson-Patman Act claim was properly denied.
 
 
 46
 Washington Mills also argues that there is no proof of recoverable damages under the Robinson-Patman Act since the jury awarded the exact amount of "commissions" or kickbacks received by BCS, $50,216.25, as damages under the Robinson-Patman Act claim. While this matter will be discussed further in connection with the motion granting a new trial, Washington Mills argues that whatever benefits accrued to BCS did not establish any injury to DeLong. However, this argument conveniently overlooks the fact that DeLong was qualified for approval as a Pratt vendor when the first purchase order let out for bid in late 1983, the October contract, went to BCS because BCS was given the lower $.495 per pound price by Washington Mills and, hence, was able to quote to Pratt a $.91 per pound price while DeLong was unable even to obtain from Washington Mills the necessary product identification for Pratt media.
 
 
 47
 D. Motion for Judgment Notwithstanding the Verdict on the Common-Law Fraud Claims:
 
 
 48
 Washington Mills argues that there can be no recovery on the common-law fraud claim of deceptive labeling of special media because DeLong's "admitted knowledge of the falsity of the representations negates any finding of reasonable reliance." This argument was addressed in DeLong II, 887 F.2d at 1519-20 and, while the law of the case is therefore a complete answer to this argument, the fact is that in reversing the district court's prior dismissal of this claim for lack of justifiable reliance, the DeLong II court specifically pointed out that where a plaintiff repeatedly confronts a defendant with the apparent falsity of its representations, and the defendant repeatedly confirms its original statement, asserting special knowledge, reliance is justified. See Georgia-Carolina Brick & Tile Co. v. Brown, 153 Ga.App. 747, 755, 266 S.E.2d 531, 539 (1980). Washington Mills argues that at trial Harold DeLong did not testify that he was deceived by the special label or that he relied on Washington Mills' alleged "superior knowledge," but, rather, said that he never believed Washington Mills "from day one." But DeLong's inward lack of belief in Washington Mills' fraudulent assertions did not demonstrate itself in any external manifestation other than continued questioning, only to be met by continued misrepresentation. We see no need for any further showing of reliance.
 
 
 49
 Washington Mills points out that the fraud was the sale by Washington Mills of essentially stock media (for which DeLong would normally have been charged $.495 per pound), deceptively labeled as "P & W special" and bearing a premium price of 85 cents. It then goes on to say that, multiplying this extra $.355 per pound by the pounds DeLong actually purchased and resold to Pratt, the total amount comes to $17,824, which, together with $100,000 in punitive damages, was the exact amount awarded by the jury. We find no fault with this judgment, since it appears to be an appropriate award, given a finding of liability.
 
 
 50
 E. Washington Mills' appeal of the denial of its motion for a new trial on liability and DeLong's appeal on the grant of a new trial on antitrust damages.
 
 
 51
 Washington Mills appeals, in connection with its argument that a new trial should have been awarded on liability, alleged errors in the district court's jury charges. First, on the Sherman Act claim, Washington Mills argues that the district court failed to charge that the jury must find some agreement to fix resale, not merely wholesale, prices; second, on the Robinson-Patman Act claim, that the court failed to charge that recoverable damages must reflect actual loss, if any, to the plaintiff, not just the benefit to the favored customer; and third, on the fraud claim, that the district court erred by charging that the plaintiff could recover the amount of the difference between the price actually charged for so-called P & W specials and the price that otherwise would have prevailed had the material been sold as generic. Each of these points is subsumed either in the arguments as to liability above or in the arguments as to damages below, and will not be dealt with further here.
 
 
 52
 DeLong appeals, first, the setting aside of the Sherman Act damage award of $2,033,295 for lost profits, before trebling. Before reaching that verdict, the jury was charged, essentially, to discount Pratt's usage of preformed ceramic abrasive media over the foreseeable future in order to arrive at DeLong's share of that market had DeLong not been terminated as a dealer. The jury verdict was based on the general factual evidence relating to DeLong's past and likely continued success as a dealer, favorable evidence of which was produced by DeLong; Pratt's needs at the Columbus plant; DeLong's willingness to meet price competition and special delivery requirements; DeLong's reputation for technical know-how, testing and delivery capacity, and willingness to work with customers; and DeLong's work history of long-term dealings with Pratt and its other customers. Evidence was adduced to show past loss profits including the amount of Pratt's media usage to the date of trial and its purchase prices. Bud Henry, Pratt's chief media buyer, testified as to Pratt's likely demand for media for 25 years after Pratt's achieving full capacity at its Columbus plant. Scott Thurman, a certified public accountant, provided expert testimony for DeLong in respect to lost profits during Pratt's startup period through its reaching of full capacity in 1994, but concentrating on the computation of factors for inflation and discount to present value. Dr. Bruce Seaman, an economist and professor at Georgia State University, offered alternative projections of lost profits from 1994 forward to 2019, the life of the Columbus plant, and testified to the assumptions underlying the five damage alternatives he presented. The defendants cross-examined the witnesses as to their assumptions, but offered no expert testimony of their own.
 
 
 53
 The district court, in setting aside the Sherman Act damages verdict, indicated that it was doing so because the expert projections were based upon the key assumption that "every single pound of Pratt and Whitney's projected media usage to the year 2019 would be Washington Mills media and that every pound of it would be sold by plaintiff." DeLong Equip. Co. v. Washington Mills Electro Minerals Corp., No. 1:86-cv-275-RLV, slip op. at 3 (N.D.Ga. Sept. 30, 1991) (order vacating judgment and, inter alia, granting motion for new trial on antitrust damages) ("DeLong Order "). This interpretation of the expert testimony, while apparently suggested by Washington Mills' post-judgment brief, does not comport with the testimony. Thurman's testimony that DeLong had suffered a loss of $694,743 in lost sales from 1985 to 1994 started from a base calculation of all sales to the Columbus plant by all manufacturers and distributors, but adjusted profits by assuming a discount of 10% in price, which, as the jury was correctly informed, is the functional and mathematical equivalent of assuming that a significant portion of the Columbus media business would go to other distributors or manufacturers. Thurman's assumption of a discount of sales price by 10% to only 90% of list, amounts to a loss of a third or more of the profit on each individual sale--the substantial equivalent of losing the same proportion of sales. The evidence supports the Thurman calculations, and we find no error that would justify setting aside that portion of the verdict. To be sure, Thurman also offered one estimate of the damages for the entire projection period, through the year 2019, which utilized the constant assumption of this price reduction, and it was apparently on the basis of this assumption that the trial court was led astray. Thurman's calculation produced a figure almost identical to one of Dr. Seaman's five alternative damage scenarios, the one on which the jury settled. However, again, Dr. Seaman presented the jury with five scenarios in which DeLong achieved different degrees of success in the market for the Pratt media business, and the assumptions behind these were based in evidence and subject to cross-examination.
 
 
 54
 The trial court, in its review of the evidence completed more than a year after the verdict, made certain additional factual assumptions that were simply not the case. These include the following:
 
 
 55
 First, Thurman did not assume that all media sold to Pratt would be Washington Mills media, except in a pricing sense, that is to say, in his own words he "identified products from Washington Mills' price lists" and used the corresponding prices from those lists to arrive at his own list price assumptions. His method of arriving at sales volume did not attribute all sales to Washington Mills.
 
 
 56
 Second, the trial court questioned whether Pratt would continue to buy through middlemen as opposed to going directly to the manufacturer. True, the media purchaser for Pratt, Bud Henry, testified that Pratt had a "goal" of reducing prices by buying directly, but he did not suggest that all sales categorically would be made directly or that Pratt would ignore the advantages of going through distributors where they outweighed the advantages of direct sales. Pratt did and does in fact use distributors, since servicing capacity and timely delivery were and presumably are of value to the company, and at the time of trial Pratt was buying the bulk of its media through another distributor, not directly. There was ample evidence to indicate that special services were provided by distributors. One could just as well suppose that Pratt could make its own media. Henry himself concluded that there was no reason that DeLong could not have continued indefinitely as one of Pratt's suppliers.
 
 
 57
 Third, as we have noted, Dr. Seaman examined the case for the lost future profits for 1994-2019 by addressing five alternative models. Despite Washington Mills' and the trial court's claims, he did assume that DeLong was not the only distributor and Washington Mills not the only manufacturer. While he assumed that in the early stages Washington Mills would have had the inside track, he also assumed that DeLong would have "made an adjustment" to be "better positioned to maintain the Pratt accounts." He thus chose different levels of competition and different responses to that competition to make his projections. His case one, not in issue here, was a mathematical extrapolation of "maximum damages." This case was based on the assumption that the trial court mistakenly thought all expert testimony rested upon--"that every single pound of Pratt & Whitney's projected media usage to the year 2019 would be Washington Mills media and that every pound of it would be sold by DeLong." DeLong Order, slip op. at 3. Case one assumed no retail price discount and no lost sales volume, and projected damages of $5,659,618.
 
 
 58
 Dr. Seaman's case two adjusted for increased competition and assumed--as had Mr. Thurman in his projections--a 10% retail price discount to protect sales volume, which produced a damage figure of $3,371,865. His case three adjusted for increased competition by assuming that DeLong would continue charging the full retail price but lose 50% of sales volume to other distributors or manufacturers, resulting in a damage figure of $3,177,181. Case four, however, made both adjustments by assuming both a 10% retail price discount and a 50% loss of sales volume to other distributors or manufacturers, arriving at the figure which the jury apparently accepted, $2,033,295. Dr. Seaman's fifth case consisted of a variation of case four in which the retail price was further reduced from 63 cents to 55 cents, resulting in total damages of $1,468,355. All of the cases, as stated, incorporate Thurman's estimate of lost profits for 1985-94 of $694,743.
 
 
 59
 The damage figure which the jury selected, Dr. Seaman's case four, then, assumed that DeLong would cut its price to 90% of list in order to meet competition but would still suffer a 50% loss of Pratt sales, and assumed that DeLong would make only one-half of all sales to Pratt with Washington Mills media. It certainly did not assume that "every single pound of Pratt & Whitney's projected media usage" would be sold by DeLong. We see nothing to indicate that the assumptions made were unreasonable or fanciful.
 
 
 60
 In sum and substance, the combination of the basic evidence and the testimony of the expert witnesses supported the Sherman Act verdict by providing a basis for the jury to project DeLong's lost profits, assuming different levels of sales volume and profit per sale, and utilizing a discount factor reflecting all of these other potential sales. See J. Truett Payne, 451 U.S. at 565-67, 101 S.Ct. at 1929 (1980); Copper Liquor, Inc. v. Adolph Coors Co., 624 F.2d 575, 580-81 (5th Cir.1980). We think the assumptions used here were reasonable in light of the evidence.
 
 
 61
 Alternatively, Washington Mills argues that Dr. Seaman's case four assumption that DeLong would have captured half of the Pratt business to the year 2019 is subject to the same fundamental fallacies as Thurman's theory of damages through 1994, namely, that there is no more basis for assuming that DeLong would have had one-half of Pratt's future business but for the termination than there is for assuming that it would have captured it at all. But the damages proof here reduced DeLong's potential sales volume to show loss of profits in open competition, and the jury verdict, to the extent it rested on Dr. Seaman's case number four, also incorporated a second adjustment assuming sales at a 90% discount off list price. We are basically dealing with a hypothetical question, in any event: what would have occurred if the defendants had not violated the antitrust laws and terminated DeLong's distributorship? See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123-24, 89 S.Ct. 1562, 1576-77, 23 L.Ed.2d 129 (1969); Malcolm v. Marathon Oil Co., 642 F.2d 845, 858-59 & n. 24 (5th Cir. Unit B 1981), cert. denied, 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981); and Lehrman v. Gulf Oil Corp., 464 F.2d 26, 46-47 (5th Cir.), cert. denied, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972). On the strength of the overall evidence, exclusive of the mathematical and economic projections, the jury properly could have concluded that DeLong would have continued to sell to Pratt on the basis of the advantages of the Washington Mills product and DeLong's superior servicing and delivery capacity. The fact that Washington Mills has in fact lost the Pratt media business to another manufacturer is, at most, an indication that its overcharging and fraud preempted its participation in future sales.
 
 
 62
 In sum, because the district court's grant of a new trial, in a 5-page order filed more than a year after the close of trial, was based on a misreading of the evidence, the court abused its discretion in discarding the jury's verdict.
 
 
 63
 DeLong also appeals the grant of a new trial on the Robinson-Patman Act damages, arguing that the jury's award of $50,216.15 should be reinstated. This sum, as we have said, is identical to the amount of kickbacks which BCS received for DeLong's sales of media to Pratt. The district court granted a new trial on these damages because it concluded that the jury had latched onto this figure despite the fact that "Robinson-Patman damages must be measured by what the disfavored buyer suffered, not by what the favored buyer gained." DeLong Order, slip op. at 4. See also J. Truett Payne, 451 U.S. at 568, 101 S.Ct. at 1930 (must prove injury from price discrimination as well as fact of price discrimination in order to recover under Robinson-Patman Act), and id. on remand, 670 F.2d 575, 583 (concluding that there was insufficient evidence of damages).
 
 
 64
 Washington Mills defends the grant of a new trial on the theory that the J. Truett Payne cases, and Hasbrouck v. Texaco, Inc., 842 F.2d 1034 (9th Cir.1988), aff'd, 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990), bar the award of "automatic damages" in Robinson-Patman cases, and that the jury in this case has awarded just such automatic damages by reasoning that the benefit to BCS should be the measure of the Robinson-Patman award. However, the cases actually say something much narrower: that it is impermissible to assume, from evidence of price discrimination, that the plaintiff suffered antitrust injury. While we certainly agree that the appropriate measure of DeLong's damages should be the extent of DeLong's injury, and not the extent of BCS's gain, we note that these sums may be related. It may be that the extra money paid to BCS corresponded, at least roughly, to DeLong's lost profits on sales made of the media for which it was overcharged and on sales lost to BCS, and to other damage resulting from the drain on DeLong's business of competing with a distributor receiving favorable prices. Although DeLong still was able to make a profit on the sales it did make to Pratt, the Supreme Court has made clear that passing on the increased price does not prevent a middleman from collecting Robinson-Patman Act damages. Kansas and Missouri, et. al. v. Utilicorp United, Inc., 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990); Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); see also Austin v. Blue Cross and Blue Shield of Ala., 903 F.2d 1385 (11th Cir.1990).
 
 
 65
 Nonetheless, we do not think it was error for the court to have concluded that the jury's award indicated that it had misunderstood or misapplied the law of Robinson-Patman Act damages by focusing not on the injury to DeLong but on the benefit to BCS. Nor did the trial court make any factual errors in setting aside the Robinson-Patman Act damages. While this is not a case in which the amount of the damages award was outside of the range of permissible verdicts, see 11 Wright and Miller § 2820, there are other circumstances in which a new trial may be awarded. In particular, where the verdict suggests that the jury was confused and misapplied the law, it is not an abuse of discretion to grant a new trial. E.g., Schneider v. Lockheed Aircraft Corp., 658 F.2d 835, 849 (D.C.Cir.1981), cert. denied, 455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982); Wood v. Holiday Inns, Inc., 508 F.2d 167, 175 (5th Cir.1975). While we think it conceivable that the jury viewed the kickbacks as a likely minimum measure of DeLong's damages as a result of the price discrimination, we think the district court was in a better position to determine whether the verdict in fact was the product of confusion. In addition to the verdict itself, the judge might have considered the possibility that the jury was distracted by the much larger Sherman Act damages claim and confused by the comparative weakness of the instructions he gave for calculating Robinson-Patman damages. The judge admonished the jury generally that recovery on all antitrust claims should be for injury to the plaintiff's business, but he offered no specific instructions for calculating the Robinson-Patman Act damages. Indeed, the district court's only explicit statement to the jury on the subject was the following:
 
 
 66
 Now, in calculating or figuring the measure of damages for price discrimination, one way that you might do that is this: The plaintiff would be entitled to recover the difference in the price of the product--strike that, that's not what I want to charge there.
 
 
 67
 In part because of this misstatement, Washington Mills sought a specific jury charge that DeLong could recover only in the amount of its own injury from the price discrimination, and not in the amount of BCS's gain. The court rejected this suggestion on the theory that the general admonition covered the point. He might have recalled, too, that DeLong's lawyers had advised the jury during closing argument that DeLong's injury, and not BCS's gain, was the appropriate measure of Robinson-Patman damages. Nonetheless, we cannot say that it was error to conclude, once the jury returned a verdict in the precise sum of the paybacks to BCS, that the jury had chosen this figure for impermissible reasons. Accordingly, we affirm the grant of a new trial on the Robinson-Patman damages.
 
 
 68
 Finally, the trial court did not err in allowing pre-judgment interest on Washington Mills' counterclaim on DeLong's open account. DeLong admitted owing the $24,532.68 amount awarded, and, hence, it is a liquidated sum within the meaning of Georgia law. Council v. Hixon, 11 Ga.App. 818, 827, 76 S.E. 603 (1912). Under Georgia law, if a party admits liability in some amount, not necessarily the amount claimed or ultimately recovered by the other party, interest may be had from the date of such admission on that amount. See Boston-Old Colony Ins. Co. v. Warr, 127 Ga.App. 364, 364, 193 S.E.2d 624, 625 (1972); Walton Motor Sales, Inc. v. Ross, 736 F.2d 1449, 1459 n. 20 (11th Cir.1984) (applying Georgia law).
 
 CONCLUSION
 
 69
 The judgment of the district court insofar as it denied Washington Mills' motions for judgment notwithstanding the verdict is affirmed. The judgment insofar as it granted the motion for a new trial on Sherman Act damages is reversed, and on Robinson-Patman Act damages is affirmed. The judgment awarding pre-judgment interest on the counterclaim for open account indebtedness is affirmed.
 
 
 
 *
 Honorable James L. Oakes, Senior U.S. Circuit Judge for the Second Circuit, sitting by designation
 
 
 [1]
 Delong I, Delong Equip. Co. v. Washington Mills Abrasive Co., 840 F.2d 843 (11th Cir.1988), involved issues of personal jurisdiction
 
 
 [2]
 Effective December, 1991, Fed.R.Civ.P. 50(b) refers to such motions as renewed motions for judgment as a matter of law. Since these motions were filed before the amendment became effective, we use the old language of motion for "judgment notwithstanding the verdict" or "JNOV."
 
 
 [3]
 Q. [By Mr. Coe]: Given his perfect setup and his positioning and his competitive pricing, Doctor, there's not a reason in the world why he [DeLong] can't capture all of Pratt's business selling Wisconsin Porcelain, Abrasive Finishing, Capco, Vibra-finish or anybody else he can get approved, is there, Ceratech; isn't that true? [Wisconsin Porcelain, Abrasive Finishing, Capco, and Ceratech are competing manufacturers of ceramic media.]